Jude ANAYA, et al., Plaintiffs,

v.

**CROSSROADS MANAGED CARE SYSTEMS, INC., et al., Defendant.**

**Civil Action No. 96–WY–1396–AJ.**

United States District Court, D. Colorado.

Aug. 28, 1997.

Gregory Robert Stross, Gregory R. Stross Law Offices, LaJunta, CO, George Stivers Meyer, Law Office of George Meyer, Denver, CO, for plaintiffs.

Don H. Meinhold, Phillip A. Vaglica, Meinhold & Maldonado, Colorado Springs, CO, Robert M. Liechty, Halaby, Cross, Liechty & Schluter, Denver, CO, for defendants.

## ORDER ON DISPOSITIVE MOTIONS

ALAN B. JOHNSON, Chief Judge.

The parties' dispositive motions, including the County Defendants' Motion for Summary Judgment, the City Defendants' Motion for Summary Judgment, the Motion for Summary Judgment filed by Crossroads Managed Care Systems, and the plaintiffs' responses to the motions, came before the Court for consideration. The Court, having considered the motions and responses, the pleadings of record and submissions of the parties, the applicable law, and being fully advised, FINDS and ORDERS as follows:

### Background and Contentions of the Parties

The defendants in this case include the City of Trinidad, its Mayor Harry Sayre in his official capacity, and its Chief of Police, James Montoya, and unnamed police officers. These defendants are referred to collectively as the "City defendants" in this order, unless otherwise specified. The group referred to as the "County defendants" includes Las Animas County, Sheriff of Las Animas County Lou Girodo and unnamed deputies, the Board of Commissioners of Las Animas County, and in their official capacities, Commissioners Eugene Lujan, Stanley Biber and Phil Valdez. Crossroads Managed Care Systems, Inc. ("Crossroads") is also a defendant. Crossroads is a private non-profit corporation providing alcohol and drug detoxification and outpatient treatment services in Trinidad.

Plaintiffs include a number of individuals who allege they were unlawfully detained and transported by law enforcement officers to Crossroads and held by Crossroads, in violation of Colo.Rev.Stat. § 25–1–310 for various periods from approximately June 30, 1995 to the time of filing the complaint. Plaintiffs assert they were unlawfully seized and held against their will and that this violated plaintiffs' rights under the United States Constitution and Colorado law. Plaintiffs allege that the defendants' acts were performed under color of state law, deprived each plaintiff of due process and the right to be free from illegal search and seizures, and deprived them of rights and privileges secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. They assert pendent state law claims of false imprisonment, negligence, negligence per se, civil conspiracy, extreme and outrageous conduct and assault.

In the amended complaint, plaintiffs offer the following historical factual background. Prior to 1995, Crossroads operated an alcohol detoxication facility ("detox") in Trinidad, Colorado. The facility was licensed by the State of Colorado and received funding from the State by contract. That facility was closed, apparently because it was not sufficiently used and because it was not profitable for the operator. After the original Trinidad detox facility closed, the nearest detox facility was in Pueblo, Colorado, approximately 85 miles from Trinidad. The Pueblo facility was also operated by Crossroads. Plaintiffs allege that the Pueblo facility received funding that included an allocation for beds dedicated to serve clients from the Trinidad area.

In 1995, plaintiffs allege that officials from the City of Trinidad and County of Las Animas advised Crossroads that they would contact state officials to request that the beds allotted for Trinidad be removed from Crossroads' use in Pueblo. Plaintiffs allege that Crossroads then had a choice of losing the allotment of beds in Pueblo or reopening the Trinidad detox facility. For whatever reason, in late 1994 or early 1995, Crossroads determined that it would reopen the Trinidad detox facility. The Trinidad facility was reopened on June 30, 1995.

The substance of plaintiffs' claims against all defendants is that they entered into a tacit, if not express, agreement designed to ensure that the Trinidad detox facility was fully utilized and would stay open in the future. This policy was also designed to ensure that Crossroads was adequately compensated and that the facility would be profitable and could therefore, remain open.

In its motion for summary judgment, Crossroads asserts that it receives funding from various sources, although the greatest part of its revenues (76.5%) are from the State of Colorado Alcohol and Drug Abuse Division of the Department of Human Services. It also receives revenues from local city/county revenues (14.7%), client fees (7.2%) and other federal and state agencies

(1.7%). Crossroads enters into contracts with the Colorado Department of Health that provide for reimbursement of its services. Under those contracts, Crossroads is disclaimed as being an agent of or an employee of the State of Colorado.

Crossroads is required to meet standards established by the Colorado Department of Health in order to be approved and licensed as a drug and alcohol treatment program. The state standards are utilized by Crossroads as guidelines, with other protocols, some of which are generated by Crossroads itself, to be followed in the operations of the Crossroads detox crisis intervention center. Those protocols give Crossroads supervisors a certain amount of discretion regarding admission, treatment, and discharge of clients into and from detox. Specific decisions regarding admission, treatment, length of an individual's stay and discharge are made by Crossroads as the operator of the detox program.

In this case, plaintiffs were taken to detox by Trinidad police officers. They assert their constitutional rights have been violated and that they were deprived of due process. Specifically, plaintiffs challenge the policy of the City of Trinidad to take intoxicated individuals to Crossroads' detox facility and the goal of keeping the facility open as an alternative to detention in jail or some other facility.

Plaintiffs allege that the defendants collectively engaged in an effort to assure that Crossroads facility in Trinidad was fully utilized by taking persons to that facility in a manner not authorized by Colorado's emergency commitment statute, C.R.S. § 25–1–310. In June of 1995, defendant Chief of Police Montoya issued General Order 95–03, which stated:

### General Order

### 95–03

Full Detox services will become available locally beginning June 30, 1995 at 17:00 hrs. Effective immediately, when an Officer has contact with any individual who exhibits any potential of intoxication, resulting from the ingestion of alcohol, drugs, inhalants or any combination of those substances, the subject is to be evaluated by Detox center staff for consider-

ation of detox treatment. All D.U.I., D.U.I.D., D.W.A.I., underage drinking 18–21 years of age, or any person arrested who is under the influence [of] alcohol or other substances, regardless of whether bond posted, or ability to post bond, will be evaluated by Detox personnel. Any person who is a danger to himself or others as a result of alcohol or drug ingestion will also be evaluated for placement. The decision to commit a subject to detox rests solely with C.M.C.S. staff.

Any individual contacted and meeting detox criteria, will be medically cleared by Officers in the following situations:

1. Adolescent individuals

2. Pregnant females

3. Obviously injured individuals

Officers should have individuals meeting any of the three above criteria medically cleared at the Emergency Room, prior to admitting the person to detox.

Additionally, Crossroads Managed Care Systems will not accept an unconscious client or any injured person who refuses medical treatment. In order to avoid conflict, officers should not refer any subject who meets the refusal criteria to Detox. The C.M.C.S. Detox will remain available contingent on full utilization. A great deal of cooperation, effort and resources went into the re-opening of this facility. If client referrals are not frequently made the facility will not remain available.

Plaintiffs' Brief in Opposition to City and County Defendants' Motion for Summary Judgment, Exhibit 1; also at City and County Defendants' Brief, Exhibit EE.

Section 25–1–310 of the Colorado Revised Statutes provides in its entirety:

(1) When any person is intoxicated or incapacitated by alcohol and clearly dangerous to the health and safety of himself or others, such person shall be taken into protective custody by law enforcement authorities or an emergency service patrol, acting with probable cause, and placed in an approved treatment facility. If no such facilities are available, he may be detained in an emergency medical facility or jail, but only for so long as may be necessary to

prevent injury to himself or others or to prevent a breach of the peace. A law enforcement or emergency service patrolman, in detaining the person, is taking him to protective custody. In so doing, the detaining officer may protect himself by reasonable methods but shall make every reasonable effort to protect the detainee's health and safety. A taking into protective custody under this section is not an arrest, and no entry or other record shall be made to indicate that the person has been arrested or charged with a crime. Law enforcement or emergency service personnel who act in compliance with this section are acting in the course of their official duties and are not criminally or civilly liable therefor. Nothing in this subsection (1) shall preclude an intoxicated or incapacitated person who is not dangerous to the health and safety of himself or others from being assisted to his home or like location by the law enforcement officer or emergency service patrolman.

(2) A law enforcement officer, emergency service patrolman, physician, spouse, guardian, or relative of the person to be committed or any other responsible person may make a written application for emergency commitment under this section, directed to the administrator of the approved treatment facility. The application shall state the circumstances requiring emergency commitment, including the applicant's personal observations and the specific statements of others, if any, upon which he relies in making the application. A copy of the application shall be furnished to the person to be committed.

(3) If the approved treatment facility administrator or his authorized designee approves the application, the person shall be committed, evaluated, and treated for a period not to exceed five days. The person shall be brought to the facility by a peace officer, the emergency service patrol, or any interested person. If necessary, the court may be contacted to issue an order to the police or sheriff's department to transport the person to the facility.

(4) If the approved treatment facility administrator or his authorized designee determines that the application fails to sustain the grounds for emergency commitment as set forth in subsection (1) of this section, the commitment shall be refused and the person detained immediately released, and the person shall be encouraged to seek voluntary treatment if appropriate.

(5) When the administrator determines that the grounds for commitment no longer exist, he shall discharge the person committed under this section. No person committed under this section may be detained in any treatment facility for more than five days; except that a person may be detained for longer than five days at the approved treatment facility if, in that period of time, a petition for involuntary commitment has been filed pursuant to section 25-1-311. A person may not be detained longer than ten days after the date of filing of the petition for involuntary commitment.

(6) Whenever a person is involuntarily detained pursuant to this section, he shall immediately be advised by the facility administrator or his authorized designee, both orally and in writing, of his right to challenge such detention by application to the courts for a writ of habeas corpus, to be represented by counsel at every stage of any proceedings relating to his commitment and recommitment, and to have counsel appointed by the court or provided by the court if he wants the assistance of counsel and is unable to obtain counsel.

The defendants have categorized the various plaintiffs who have filed suit in this action into three general categories.[1] The first set of plaintiffs were under arrest for various criminal activities and were taken to detox. The second group of plaintiffs were taken to detox for evaluation by the professionals at Crossroads as to whether those individuals needed to be taken into custody under the Emergency Commitment Act. The third group of plaintiffs includes those who were taken into custody by the Colorado State Patrol.

---

**1.** Two plaintiffs, Robert Velasquez and Dennis Montano, have been dismissed by separate order for failure to appear at their depositions. *See* April 17, 1997 Order Adopting Findings and Recommendation and Dismissing Plaintiffs Robert Velasquez and Dennis Montano.

Plaintiffs under arrest included: Jude Anaya (arrested on charges of possession of marijuana and domestic violence); Erica Fabec (underage drinking); Dan Gallegos (domestic violence); Mario Incitto (underage drinking); Michael Romero, taken to detox numerous times, usually as the result of the complaints of his mother.

Plaintiffs taken into custody under the authority of the Emergency Commitment Act: Gasper Barela (two separate occasions); Patricia Dominguez (taken from her home, upon response by police to a domestic violence call from her sister); John Garcia (discovered sleeping in his car); Haskell Hooks (four occasions); Clyde Jones (mixed arrest and emergency commitment holds; first occasion "obviously intoxicated;" fleeing a bar fight; attending to another who had been stabbed in a bar fight); Thor Jones (mixed claims; arguments; running stop sign and conviction for DWAI); Edward LeRoux (spotted by officer while hitchhiking and taken to detox); Owen Shugard (stopped while walking home from a bar; taken to detox for evaluation); Steve Torma (drinking at bar).

Plaintiffs with whom the City had no contact included Leonard Dominguez and Charlene Villani, both picked up by the Colorado State Patrol. Their complaints are solely asserted against defendant Crossroads.

Plaintiffs have asserted nine claims: (1) a claim under 42 U.S.C. § 1983 premised upon a due process violation arising under both the Fifth and Fourteenth Amendment; (2) a § 1983 claim alleging an unreasonable seizure under the Fourth Amendment; (3) a claim under Colorado Constitution premised upon an alleged due process violation; (4) a second claim under the Colorado Constitution alleging unreasonable seizures; (5) pendent state tort claim of false imprisonment; (6) pendent state tort claim of negligence per se for violations of the Emergency Commitment Act; (7) pendent state tort claim of civil conspiracy; (8) pendent state tort claim of outrageous conduct; and (9) pendent state tort claim of assault and battery.

The City defendants argue that the due process claims should be dismissed. They assert the Fifth Amendment's due process clause does not apply to states and that there is no due process claim where the state action concerns an alleged seizure. Due process seizure claims should be analyzed under the Fourth Amendment, not the Fourteenth Amendment, defendants argue, citing *Graham v. Connor*, 490 U.S. 386, 394–396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Defendants also argue that the direct claims under the Colorado Constitution must be dismissed because Colorado has no statutory analogue to 42 U.S.C. § 1983, and the Tenth Circuit, in *Specht v. Jensen*, 863 F.2d 700, 702 (10th Cir.1988), held that there is no *Bivens*-type claim under the Colorado Constitution. This requires dismissal of the third and fourth claims.

The City also asserts that it has statutory immunity from the pendent state tort claims (the fifth through ninth claims), pursuant to C.R.S. § 24–10–108. Chief Montoya asserts that he has qualified immunity from the state tort claims. Under C.R.S. § 24–10–118(2), he argues he is entitled to immunity unless plaintiff demonstrates that his conduct was willful and wanton. Chief Montoya also argues he is entitled to qualified immunity from plaintiff's Fourth Amendment claim for unreasonable seizure. Montoya asserts that a supervisor is liable under § 1983 for the actions of subordinates only when the supervisor is deliberately indifferent to the fact that subordinates are violating the constitutional rights of others, after being put on notice of same, citing *Gates v. Unified School District*, 996 F.2d 1035, 1041 (10th Cir.1993). When an individual is sued under § 1983, qualified immunity protects him from the burden of further litigation, until plaintiffs demonstrate that his actions violated clearly established law, citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir.1995).

Here, the defendant asserts the complaints against Montoya are essentially the same as asserted against the city,[2] based upon the written policy embodied in General Order 95–03 regarding use of the detox center. Montoya argues that General Order con-

---

**2.** The City is not entitled to qualified immunity. The City may only be liable under § 1983 if the City's official policy was the "moving force" be-

hind a constitutional violation, citing *Gates v. Unified School District*, 996 F.2d at 1041.

forms with C.R.S. § 25–10–310, particularly as the general order is consistent with the requirements of the act that the facility administrator make the decision as to whether an intoxicated person should be committed.

Defendants argue there is a substantial need for a detox facility in the Trinidad area because of significant problems with alcohol, drinking, and underage drinking. Defendant Montoya argues that it was clearly established in 1995 that under Colorado law the decision to take a person to detox for evaluation under the Emergency Commitment Act was discretionary and one for which the officer would not be liable. Additionally, taking an individual to detox for evaluation is not an arrest and the public policy of Colorado is to ensure that emergency commitments are utilized to further the health and safety of the citizens of Colorado. Montoya asserts there was no clearly established federal law which is contrary and indeed that there was no federal constitutional law on the topic at all. This, defendant argues, requires this Court to determine whether General Order 95–03 directing officers to take people with whom they have had contact to detox for evaluation, if they had been drinking, amounts ·to an unreasonable seizure under the Fourth Amendment.

Defendant submits that it was not clearly established in 1995 that this type of police activity (taking an individual to detox for evaluation) would be an unreasonable seizure under the totality of the circumstances. He notes there was a bona fide drinking problem in the Trinidad area, the seizure was a minimal intrusion because it involved only taking an intoxicated person to detox for evaluation, and finally because a number of the plaintiffs were taken to detox under the Emergency Commitment Act and not because of an arrest, there were substantial reasons for having them evaluated by the detox center. A reasonable officer in Montoya's position would not know that he was violating clearly established constitutional rights by issuing General Orders at issue in this case.

With respect to arrested plaintiffs who were taken to detox, defendant Montoya argues their seizure was reasonable as there was probable cause for the seizure. In each instance, Montoya argues there was probable cause for the seizure and thus the general orders could not constitute any constitutional violation.

The County defendants (Las Animas County, the sheriff of Las Animas County, its Board of County Commissioners and the commissioners in their official capacities) assert they are entitled to summary judgment because they had no involvement with any plaintiff in the case. The individual County defendants are entitled to federal qualified immunity from the federal claims and state qualified immunity from the pendent state torts. The County is entitled to state statutory immunity from the pendent state torts. The County defendants join in the arguments asserted by the City defendants.

Plaintiffs filed a response to the City and County defendants' motions for summary judgment. Plaintiffs note that the municipality may not claim qualified immunity and may not defend a § 1983 action based upon the good faith of its officials. Plaintiffs argue that the City defendants are only entitled to statutory immunity if they have acted in compliance with the Emergency Commitment Act. However, if they acted without probable cause of clear dangerousness and thus, wrongfully detained individuals, defendants are liable under § 1983, and if those actions were willful and wanton in ignoring the statute, the defendants would also be exposed to state tort liability. The plaintiffs argue that there was not any determination by police that the plaintiffs detained were clearly dangerous to themselves or others when they were taken to detox. Plaintiffs assert that General Order 95–03, which required officials having contact with individuals who exhibit any potential of intoxication to be evaluated by detox center staff, is contrary to the plain language of C.R.S. § 25–10–310. Plaintiffs argue that the statute does not allow detention of individuals who are potentially intoxicated, but rather only allows those who are intoxicated and clearly dangerous to themselves or others to be detained, and only when there is probable cause to support such a belief. Plaintiffs argue the effect of General Order 95–03 was to remove all discretion and establish a City policy contrary to the statute. They assert that it was the practice, custom and policy of

law enforcement to detain without probable cause of clear dangerousness, which is inconsistent with the express language of the statute and a violation of plaintiffs' constitutional rights. In their brief, plaintiffs' central constitutional claim is that their Fourth Amendment rights to be free from unlawful seizure were violated in this case. The unlawful seizure in each instance is being taken to detox in a manner which was contrary to statute and federal law and that it does not matter whether any plaintiff was in protective custody or under arrest. The circumstances of each plaintiff's detention in the detox facility are also discussed in the plaintiffs' brief in opposition.

Plaintiffs concede that their 42 U.S.C. § 1983 claim of denial of due process must proceed under rights granted under the Fourteenth Amendment to the United States Constitution, rather than the Fifth Amendment, as alleged in the complaint. They assert they have properly pleaded a Fourteenth Amendment due process claim and that the defendants have failed to demonstrate entitlement to judgment as a matter of law. Plaintiffs further admit that it is "very likely that other adequate remedies exist under the Federal constitution and state tort law claims," and thus, that no implied remedy arising under the Colorado Constitution is likely to be necessary.

Plaintiffs agree that the City correctly asserts it is protected by statutory immunity from the pendent state tort claims pursuant to C.R.S. § 24–10–101 et seq. However, the § 1983 claims against the City are not affected by such statutory immunity. Plaintiffs also assert that the § 1983 claims present multiple questions of fact that preclude summary judgment, including by way of example whether the individual plaintiffs' seizures were unreasonable; whether there was a collusive effort to provide bodies to detox; whether the City adopted an official policy

contrary to the law; whether the practice was widespread; whether the police chief was deliberately indifferent; whether the City council was indifferent to such practices; and whether the individual police officers knew the policy violated the Fourth Amendment.

Plaintiffs assert there is no official immunity for defendant Montoya for the pendent state tort claims. Plaintiffs argue that their most significant state claim is the claim for civil conspiracy. They explain that if this claim is established, then liability for other tortious acts by other defendants in furtherance of the conspiracy would be imputed to defendant Montoya, citing C.R.S. § 13–21–111.5(4). Additionally, defendant Montoya may be found liable for other tort claims even if the civil conspiracy claim is not established.

Plaintiffs argue that General Order 95–03 [3] provides direct evidence of an agreement to consciously conspire and deliberately pursue a common plan that resulted in a tortious act. Plaintiffs argue that if they can prove that referrals by police to detox occurred illegally or resulted in tortious actions against the plaintiffs, they have established civil conspiracy. General Order 95–03, coupled with Montoya's eighteen months of meetings participating with the Trinidad Advisory Board in the plans to re-open the Trinidad Detox facility, is significant evidence that establishes conclusively the plaintiffs' civil conspiracy claim.

Plaintiffs contend that the conspiracy actors included Montoya, agents of Crossroads, police officers, the City Council, the Las Animas County Commissioners and Las Animas County Sheriff Girodo. The object of the conspiracy was the "reopening of the Crossroads detox facility by obtaining state funds to reopen and operate the detox facility."

---

**3.** General Order 95–03 was rescinded and replaced November 6, 1995, with General Order 95–04. The dispute in this case concerns primarily General Order 95–03, although plaintiffs contend that under either General Order 95–03 of 95–04, the defendants acted unconstitutionally, and contrary to 25–1–310, in taking plaintiffs and others to detox for evaluation, in that it requires police to take intoxicated persons without making a corresponding determination that

the intoxicated person is clearly dangerous to the health and safety of himself or others. The text of General Order 95–04 is quite similar to 95–03, with an additional requirement that the officer is to submit to the officer of the Chief of Police a memorandum of all contacts on detox committals. The same analysis obtains for General Order 95–04 as for 95–03. The full text of General Order 95–04 is set forth in the Appendix to this Order.

The agreement on course of action was to artificially boost the numbers of detainees referred to Crossroads by law enforcement. The unlawful acts in furtherance of this conspiracy include law enforcement's intentional disregard for the requirements of the emergency commitment statute, seizing individuals without legal basis and contrary to the Fourth Amendment of the United States Constitution, physically restraining individuals' freedom, reckless indifference to insuring the laws are abided by and enforced, and flagrantly ignoring and abusing the law and abusing law enforcement authority to serve illegal and unjustified ends. Plaintiffs contend that Chief Montoya's statement that his staff would let detox assess whether individuals met the criteria for detox is alone sufficient proof of willful or reckless disregard of C.R.S. § 5–1–310, which plaintiffs contend requires that law enforcement officials acting pursuant to that statute make a determination in order to have probable cause.

Plaintiffs urge that defendants' analysis regarding qualified immunity is wrong. The plaintiffs contend that, in addition to improper supervision of police officers, defendant Montoya himself willfully and wantonly developed and orchestrated a plan expressly intended to violate the law. In furtherance of that goal, he met regularly with other defendants and developed policies violative of the plaintiffs' constitutional rights. Plaintiff contends that it was clearly established in 1995 that the Fourth Amendment guaranteed the right to be free of unreasonable seizures, citing *Workman v. Jordan*, 32 F.3d 475, 478–479 (10th Cir.1994). They argue that under the Fourth Amendment, police are required to have probable cause to arrest before a person can be subjected to deprivations of liberty that result from being detained, citing *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). They assert the evidence in this case could not cause any person of ordinary prudence and caution to reasonably believe that the individuals taken to detox were clearly dangerous to the health and safety of himself or others.

Plaintiffs assert that the individual governmental officials in this suit are not protected by qualified immunity because they have demonstrated that the defendants' actions violated federal constitutional rights. The rights of due process of law and the right to be free from unlawful seizures are clearly established and are rights of which a reasonable person would have known.

As to the County defendants' motion, plaintiffs reiterate arguments made with respect to the City defendants. The distinguishing difference is that the County defendants, including the Las Animas County Commissioners and the Sheriff, all took active roles in the alleged improper activity.

Crossroads' motion for summary judgment argues that plaintiffs' claims against it under 42 U.S.C. § 1983 fail because plaintiffs have failed to show that it deprived them of a specific constitutional right while acting under color of state law. Crossroads believes that plaintiffs have clearly identified only one federal claim against Crossroads, which is the alleged violation of a liberty interest in being free from an unwarranted confinement, an interest protected by the Fourteenth Amendment.

Crossroads argues that plaintiffs have not demonstrated that it, a private non-profit corporation, was acting under color of state law as a state actor when it allegedly unlawfully detained plaintiffs at the Trinidad detox facility. Crossroads argues that its actions are not fairly attributed to the state, an analysis required by *Lugar v. Edmondson*, 457 U.S. 922, 929–934, 102 S.Ct. 2744, 2749–2752, 73 L.Ed.2d 482 (1982). The two components of the *Lugar* fair attribution test, state policy (requiring that the deprivation of constitutional rights must be caused by the exercise of some right or privilege created by the state or a rule of conduct imposed by the state or by a person for whom the state is responsible) and state actor (or that the defendant is a person who can fairly be said to represent the state because he is a state official or his conduct is otherwise chargeable to the state), are not satisfied in this case.

Plaintiffs have not, Crossroads argues, satisfied their burden of showing that Crossroads, a private actor, was acting under color of state law so that § 1983 liability attaches. If this Court dismisses plaintiffs' § 1983 claims against Crossroads, Crossroads argues that supplemental jurisdiction should not be exercised over the plaintiffs' state law

claims. However, if the Court does determine that it should exercise supplemental jurisdiction, Crossroads then argues that plaintiffs' pendent state tort claims (outrageous conduct, conspiracy, Colorado constitutional claims, negligence and respondeat superior, false imprisonment, assault and battery) should also be dismissed.

Plaintiffs have responded to Crossroads' motion by arguing that Crossroads' actions were indeed actions taken under color of state law, and constitute a violation of the Fourteenth Amendment, establishing a right to recover under Section 1983. Plaintiffs assert that there is overwhelming direct evidence that this defendant acted jointly with state actors. Evidence includes the minutes of the Trinidad Advisory Board detailing the intentions of Crossroads to reopen the detox facility, in conjunction with efforts of the other numerous governmental actors. General Order 95–03 was developed directly as a result of that joint activity and is, on its face, contrary to the Colorado emergency commitment statute. Plaintiffs insist the defendants have acted in concert and that Crossroads has a fundamental misunderstanding of their complaints. Plaintiffs state that they do not argue Crossroads is an agent of the state merely because of its contracts or regulations or that it may be liable merely because it performed actions pursuant to contracts or regulations. They state "[t]he incontrovertible facts, ... are that local government officials (City Police Chief, County Sheriff), worked closely with Crossroads (Trinidad Advisory Board) to develop illegal policies (General Order 95–03 and jail referrals to detox without legal basis) and 'provided such significant encouragement that the challenged decisions (to detain individuals at Crossroads without lawful basis under 25–1–310) ... must, in law be deemed to be that of the State.'" Plaintiffs' Brief in Opposition to Crossroads' Motion, at 9.

Plaintiffs argue that under any test regarding "under color of state law," Crossroads has failed to demonstrate there are no issues of material fact which would entitle Crossroads to summary judgment. As to the state law claims, plaintiffs agree that supplemental jurisdiction is discretionary, and urge that it may be properly exercised in this case. The claims of the plaintiffs against each of the defendants are based upon identical and inseparable facts. Separate trials would present unnecessary repetition and duplications of issues, facts and witnesses.

## Standard of Review

### Motions for Summary Judgment

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether these burdens have been met, the court is required to examine all evidence in the light most favorable to the non-moving party. *Barber v. General Electric Co.*, 648 F.2d 1272 (10th Cir.1981).

Once the moving party has met its initial burden, the burden shifts to the party resisting the motion. That party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Manders v. Oklahoma ex rel. Dept. of Mental Health*, 875 F.2d 263, 265 (10th Cir.1989) citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–2554.

## Discussion

*1. 42 U.S.C. § 1983 and the Colorado Emergency Commitment Statute*

■ Title 42 U.S.C. § 1983 is a broadly written statute. it provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdic-

tion thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or any other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. Section 1983 is not a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere. *Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989), citing and quoting *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979).

There is no question that the police officers who detained the various plaintiffs and transported them to the Crossroads detox facility were acting under color of state law. Under the Colorado emergency commitment statute, law enforcement authorities acting with probable cause are authorized to take any person intoxicated or incapacitated by alcohol and clearly dangerous to the health and safety of himself or others into protective custody and placed into an approved treatment facility. The decision to retain an individual for emergency commitment in the approved treatment facility lies with the facility administrator or his authorized designee. The statute also authorizes officers to assist to their homes persons who are intoxicated or incapacitated by alcohol but not clearly dangerous to the health and safety of themselves or others.

The language of the statute "indisputably articulates a clear legislative determination that the act of taking a person into civil protective custody is not an arrest." *Colorado v. Dandrea,* 736 P.2d 1211, 1214 (Colo. 1987). Colorado has expressed its legislative policy and purposes of the emergency commitment act in C.R.S. § 25–1–301:

(1) It is the policy of this state that alcoholics and intoxicated persons may not be subjected to criminal prosecution because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society. The general assembly hereby finds and declares that alcoholism and intoxication are matters of statewide concern.

(2) With the passage of this part 3 at its first regular session in 1973, the forty-ninth general assembly has recognized the character and pervasiveness of alcohol abuse and alcoholism and that public intoxication and alcoholism are health problems which should be handled by public health rather than criminal procedures. The general assembly further finds and declares that no other health problem has been so seriously neglected and that, while the costs of dealing with the problem are burdensome, the social and economic costs and the waste of human resources caused by alcohol abuse and alcoholism are massive, tragic, and no longer acceptable. The general assembly believes that the best interests of this state demand an across-the-board locally oriented attack on the massive alcohol abuse and alcoholism problem and that this part 3 will provide a base from which to launch the attack and reduce the tragic human loss, but only if adequately funded. Therefore, in response to the needs as determined by an ad hoc committee and to assist in the implementation of this part 3 at both the local and state level, the general assembly hereby appropriates moneys for: Receiving and screening centers and their staffs; medical detoxification; intensive treatment, halfway house care, outpatient rehabilitative therapy; orientation, education, and in-service training; division staff for the administration, monitoring, and evaluation of the program; and operating costs for patient transportation.

In 1983, in *Carberry v. Adams County Task Force on Alcoholism,* 672 P.2d 206 (Colo.1983), the Colorado Supreme Court reviewed due process considerations with specific reference to the state's emergency commitment statute § 25–1–310. In that case the plaintiff, who was walking home, was picked up by police in early morning hours and was taken to Washington House, an alcohol detoxification center run by the Adams County Task Force on Alcoholism. The lower court had determined that the standard set out in § 25–1–310 was an unconstitution-

ally vague standard for committing and releasing intoxicated persons. The judgment of the lower court was reversed and vacated by the Colorado Supreme Court. In its opinion, the Colorado Supreme Court stated:

The threshold inquiry is whether the emergency commitment of Carberry deprived him of a liberty interest protected by the due process of the Fourteenth Amendment to the United States Constitution and Article II, section 25 of the Colorado Constitution.... It is conceded that holding Carberry in Washington House for four days deprived him of liberty. We recognize that "a civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." ...

The dispute in this case centers on whether due process requires a judicial hearing to minimize the risk of an erroneous commitment.... Due process is a flexible standard which does not call for the same procedural safeguards in all situations ... Due process prescribes orderly procedures balanced to protect constitutional interests while furthering legitimate governmental objectives ...

In the context of an emergency commitment, due process requires consideration of three distinct factors: (1) the weight of the governmental interest in the emergency commitment process; (2) the severity of the deprivation suffered by the individual as a result of the governmental action; and (3) the functional appropriateness of the procedures for minimizing the risk of an erroneous decision, together with the probable value, if any, of additional safeguards ...

The state has a compelling interest in protecting an intoxicated individual and the general public from the catastrophic consequences of alcohol abuse. The state also has an interest in providing treatment to alcoholics "in order that they may lead normal lives." ... We recognize, however, that an individual committed under section 25–1–310 has a substantial interest in avoiding the "massive curtailment of liberty" and the "adverse social consequences," resulting from emergency commitment ...

In our view, a judicial hearing as a prerequisite to commitment of a clearly dangerous intoxicated person would hinder the government's efforts in controlling alcohol abuse without providing additional procedural safeguards. Due process demands only that a neutral factfinder independently determine that the statutory requirements for commitment and release are satisfied.... Due process does not dictate that the neutral and detached factfinder be "law-trained or a judicial or administrative officer." ... An independent factfinder strikes the proper balance between the public's right to protection from alcohol related tragedies and the individual's right to be protected from unjustified commitment....

*Carberry v. Adams County Task Force on Alcoholism,* 672 P.2d 206, 209–210 (Colo. 1983) (citations and footnote omitted).

The emergency commitment statute is again considered in *Leake v. Cain,* 720 P.2d 152 (Colo.1986), a wrongful death action in which plaintiffs sought damages for the deaths of their children when they were struck and killed by an automobile driven by Ralph Crowe. Crowe, then 18, had been at an outdoor teenage party and had been drinking beer and alcoholic punch. At 11:30 that night, the police were dispatched to break up the party after a neighbor complained. Crowe became disruptive and was handcuffed and detained by police. Crowe's younger brother approached the officers, requested that his older brother be released to him and told the officers he would drive his brother home. After they determined that Crowe's younger brother was sober and after checking his driver's license, they agreed to let him leave the party with his older brother. Crowe, the younger Crowe and another person left the party with the younger Crowe brother driving. The Crowe brothers dropped off the other person and then stopped at a convenience store. When they left the store, Ralph Crowe rather than the younger brother was driving the car. The car driven by Ralph Crowe later struck six persons on the street, killing two of them.

In the wrongful death action, Ralph Crowe, Crowe's father, the five police officers who had been dispatched to the party and permitted Ralph Crowe to leave with his

younger brother were all sued. As to the police, the plaintiffs alleged the police officers were negligent in failing to take Ralph Crowe into custody. One of the matters considered by the Colorado Supreme Court was the Colorado emergency commitment statute, § 25–1–310. The Colorado Court stated:

A duty of care may be created by legislative enactment.... However, the breach of a statutory duty is actionable only by one who is a member of the class the statute was designed to protect, and only where the injury suffered by such person is the type of injury which the statute was enacted to prevent.

Section 25–1–310(1) was enacted as a part of a comprehensive legislative scheme dealing with alcoholism and intoxication treatment ... The legislative declaration preceding the statutory scheme states:

(1) It is the policy of this state that alcoholics and intoxicated persons may not be subjected to criminal prosecution because of their consumption of alcoholic beverages but rather should be afforded a continuum of treatment in order that they may lead normal lives as productive members of society. The general assembly hereby finds and declares that alcoholism and intoxication are matters of statewide concern.

§ 25–1–310(1). We recognize that a cursory reading of the emergency commitment statute may suggest that the statute was intended to protect members of the public against intoxicated persons who appear "clearly dangerous." However, in our view, the General Assembly did not intend to create a claim for relief against police officers who, in their discretion, release an intoxicated person into the "custody" of an apparently sober and responsible relative.

Since we conclude that the respondents' decedents were not included within the class of persons that section 25–1–310(1) was designed to protect, the respondents may not rely on the statute as a source of the officers' duty in this case.

*Leake v. Cain,* 720 P.2d at 162–163 (citations omitted).

The emergency commitment statute was visited again by the Colorado Supreme Court in *People of Colorado v. Dandrea,* 736 P.2d 1211 (Colo.1987). The Colorado Court discussed civil protective custody in the context of a challenge to a warrantless search leading to the discovery of controlled substances. The Colorado Court noted that persons taken into civil protective custody because of intoxication are treated differently from those persons who are placed under custodial arrest because of suspected criminal conduct. Police officers encountering intoxicated persons must distinguish between criminal custodial arrests and civil protective detentions. *Colorado v. Dandrea,* 736 P.2d at 1214. "The detention authorized by the Act is permitted only to prevent harm to the detainee or others resulting from the detainee's conduct or inability to act ... The Act, therefore, cannot be used directly or indirectly to justify the equivalent of a criminal custodial arrest not supported by probable cause." *Id.* at 1215 (citations omitted). Noting that the Act does not require a warrant prior to placing an individual in civil protective custody, and recognizing the legislative policy, that court considered what the proper construction of the statute should be. It stated:

A warrantless search is presumptively invalid under the fourth amendment to the United States Constitution and article II, section 7, of the Colorado Constitution, subject only to a few narrow and specifically delineated exceptions.... The general requirement that a search proceed only upon prior approval by a judge or magistrate interposes a neutral and detached judicial officer between the police and the "persons, houses, papers, and effects" of the citizen, thus ensuring the protection of those areas of a person's life to which reasonable expectations of privacy attach.... The constitutional test of a warrantless search ultimately is reduced to the question of whether the search was reasonable under all relevant attendant circumstances ... The prosecution bears the burden of establishing that some basis exists to justify departure from the fundamental principle of federal and Colorado constitutional law that a warrantless search is presumed to violate the reasonable expectation of freedom from intrusion into the privacy of one's person and personal effects enjoyed by all private parties ...

Any determination of what constitutes reasonable warrantless police conduct in civil protective custody detentions authorized by the Act must take into account the absence of certain factors deemed most significant in determining the permissible scope of warrantless searches of suspected criminals. The primary justifications for permitting warrantless searches or seizures incident to custodial arrests are preserving and avoiding destruction of evidence of the crime for which the defendant has been arrested and protecting the safety of arresting officers.... Another exception to the warrant requirement is recognized for items discovered in plain view in the course of an otherwise permissible search; however, only where there is probable cause to believe those items are associated with criminal conduct is further search of the items permissible ... In these few and narrowly defined circumstances, the governmental interests are deemed sufficiently important to permit warrantless searches and seizures so long as the invasions of personal privacy rights are limited to the furtherance of those interests....

In civil protective custody cases such as this one, no governmental interest in locating or preserving evidence of a suspected crime is present. However, the Act does contemplate the transportation of some persons to various locations. Therefore, one factor to be considered in balancing a detainee's privacy interest against legitimate governmental needs to interfere with that interest is the safety of the officer as well as the detainee during such transportation ... While the goal of assuring officer safety is admittedly important, the legislative emphasis on the noncriminal nature of the contact between government officials and private citizens in civil protective custody settings requires that in such settings the individuals' privacy interest must be accorded maximum weight in determining the reasonableness

of police conduct.... These features of civil protective custody cases distinguish them from cases involving searches incident to custodial arrests...

*Dandrea,* 736 P.2d at 1215–1218 (citations omitted).

## 2. Qualified Immunity Issues—County and City Defendants

### A. County Defendants

▇▇▇▇ "[A]n official-capacity suit is in all respects other than name to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); cited in *Moore v. City of Wynnewood,* 57 F.3d 924, 929 n. 4 (10th Cir.1995). The official capacity allegations are a means of bringing suit against Las Animas County. Further, where no constitutional violation is found against county officials, a county is properly dismissed. *Webber v. Mefford,* 43 F.3d 1340, 1344–1345 (10th Cir.1994).

▇▇▇▇ Under § 1983, a local government may only be held liable for the constitutional violations committed by its employees when the employee "action pursuant to official municipal policy caused a constitutional tort." *Hollingsworth v. Hill,* 110 F.3d 733, 741 (10th Cir.1997).

Therefore, "to establish municipal liability a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."

*Hollingsworth v. Hill,* 110 F.3d at 742 (citations omitted). A local government generally will not be liable to respond in damages for the actions of its employees under a *respondeat superior* theory or a theory of vicarious liability, except in very limited instances. These include whether the local government (which includes both the City and County in the instant case) had an established custom or policy, as alleged by plaintiffs, and whether the actor is the final policy making authority of the local government in the area which is the subject of dispute.[4]

---

4. This exception is discussed in *Schepp v. Fremont County,* 900 F.2d at 1454. In that case the circuit court stated:

A municipality is not liable under 42 U.S.C. § 1983 for the actions of its employees on a theory of *respondeat superior* or vicarious lia-

bility.... The Supreme Court has held that a municipality may be held responsible under § 1983 for inadequate supervision and training of its employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees]

Under either analysis, the official capacity suit against the County defendants, including the Board of County Commissioners, and each Commissioner, may not proceed. The plaintiffs have not demonstrated any established policy or practice violative of federal law concerning the detention of intoxicated persons pursuant to the Colorado Emergency Commitment Act that supports a § 1983 claim. Contrary to the plaintiffs' claims, the documents and materials provided in support of the complaint and in resistance to the pending dispositive motions, which have been thoroughly and carefully reviewed by the Court, do not demonstrate more than an agreement to utilize local detox facilities for taking intoxicated persons into protective custody and an agreement to attempt to retain as a resource available to the community a facility capable of providing treatment for persons affected by alcohol and alcohol-related problems. There is no evidence before the Court that suggests there is any established policy, pattern or practice of any of the County defendants, relating to or concerning the detention and taking into protective custody of intoxicated persons as alleged by plaintiffs. In fact, utilization of the detox facilities is consistent with the expressed legislative policy of the State of Colorado that treatment and evaluation of intoxicated persons pursuant to the Emergency Commitment Act is preferred to criminal dispositions.

#### B. City and County Defendants

■ In the complaint, plaintiffs set out sweeping allegations asserting acts by all City and County defendants which are claimed to be conspiratorial in nature and in violation of federal law. However, "[m]ere characterization of defendants' conduct as conspiratorial or unlawful does not set out allegations upon which relief can be granted." *Thompson v. Aland,* 639 F.Supp. 724, 729 (N.D.Tex.1986). In cases invoking 42 U.S.C. § 1983, a plaintiff must state specific factual allegations and not merely conclusory allegations. *Id.* To state such a claim for relief under section 1983, a plaintiff:

> come in contact." ... Such deliberate indifference arises where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of

must show that he has been deprived of any rights, privileges, or immunities secured by the Constitution and laws and that the defendant acted under color of state law. In *Brown v. Chaffee,* 612 F.2d 497, 501 (10th Cir.) (quoting *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492), we held that:

> "Acting under color of state law as required by section 1983 is defined as the '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' "

*Pitts v. Turner and Boisseau, Chartered,* 850 F.2d 650, 653 (10th Cir.1988). Here, plaintiffs' complaint does not contain factual allegations of conduct by any of the city, county or private defendants which support a legitimate claim under 42 U.S.C. § 1983. The allegations are conclusory and are not sufficient under § 1983.

#### C. City Defendants

■ As noted earlier, plaintiffs have claimed that the City defendants deprived them of their due process rights under the Fourteenth Amendment of the United States Constitution. The substance of plaintiffs' claims is that the City defendants, including the City of Trinidad, its Mayor Harry Sayre in his official capacity, and Chief of Police Montoya, in his individual and official capacities, violated their Fourteenth Amendment due process rights and their Fourth Amendment rights to be free from unreasonable search and seizures. The plaintiffs assert that the City defendants violated these rights by agreeing to utilize the Crossroads detox facility, by issuing General Order 95-03, and by taking persons to Crossroads for evaluation without first making a determination whether the person detained and transported to detox was clearly dangerous to the health and safety of himself and others, all contrary to § 25-1-310. Plaintiffs conceded they have no cognizable § 1983 claim based upon a violation of the Fifth Amendment of the United States Constitution.

> constitutional rights, that the policy makers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 1454–1455 (citations omitted).

In this case, the plaintiffs propose that the basis for holding the local government entities liable under § 1983, including the City (and County), is participation in the plan to re-open the Trinidad detox facility and ensure use at a level that would guarantee the facility would remain open. This goal would be accomplished, with respect to the City, through the issuance of General Order 95–03, which was the directive to be followed by law enforcement authorities required to deal with intoxicated individuals during the course of performance of their jobs.

There are no facts here that suggest any of the plaintiffs were not consuming alcohol when they were taken to Crossroads for evaluation. The plaintiffs have suggested, however, that it is the language of General Order 95–03 itself, stating that any person who is "potentially intoxicated" shall be taken to detox for evaluation, that is the source of the constitutional violations at issue in this case. This Court disagrees.

Colorado law has expressly stated, in its statement of legislative policy and purpose, as well as in the language of the emergency commitment statute, that it is preferable for intoxicated persons to receive treatment rather than prosecuting those individuals criminally. The issuance of General Order 95–03 furthers and is consistent with that purpose. The Court finds no constitutional violation.

As to the plaintiffs' Fourth Amendment search and seizure arguments, *Graham v. Connor*, 490 U.S. 386, 394–396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), requires that the seizure be analyzed under an objective reasonableness standard that "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quotation and citations omitted). The "reasonableness" must be judged from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 1872. This does not require one to assume, however, that intoxication requiring police intervention will necessarily implicate a finding that, *per se*, a clear danger exists.

Defendant Montoya has asserted that he is entitled to qualified immunity because plaintiffs have failed to show that he violated clearly established law. This Court agrees that defendant Montoya is entitled to qualified immunity. The Tenth Circuit has stated:

Qualified immunity is designed to shield public officials from liability and ensure "that erroneous suits do not even go to trial." ... Thus, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." ...

Once a defendant pleads qualified immunity, the plaintiff initially bears a heavy two-part burden.... First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right ... Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.... "[P]laintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." ... To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." ... Although the very action in question does not have to have previously been held unlawful, "in the light of pre-existing law the unlawfulness must be apparent." ... "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of the authority from other courts must have found the law to be as the plaintiff maintains..."

If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity.... Thus, a defendant is entitled to qualified immunity if the plaintiff fails to show a violation of a constitutional right at all ... Further, a defendant is entitled to qualified immunity

if the plaintiff fails to show that the law was clearly established ...

Only if the plaintiff succeeds in carrying his two-part burden, does the burden shift to the defendant. At that point, the defendant must show "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." ... If the court concludes Plaintiff has carried his burden, the court should state on the record the clearly established constitutional right it finds the defendant violated....

*Albright v. Rodriguez,* 51 F.3d 1531, 1534–1535 (10th Cir.1995) (citations and parentheticals omitted).

■ Reasonable officials in the situation of the individual defendants must have understood that their conduct violates that clearly established constitutional right. *Liebson v. New Mexico Corrections Department,* 73 F.3d 274, 276 (10th Cir.1996). *See also Hollingsworth v. Hill,* 110 F.3d 733 (10th Cir.1997).

■ In this case, it is clear that plaintiffs have been unable to articulate a clearly established right that any of the defendants violated when they participated in the plan to try to re-open the Trinidad Crossroads detox facility or when that facility was actually utilized by taking plaintiffs and others who were intoxicated to the facility for evaluation. The plaintiffs have not cited any authority that indeed suggests participation in community activities designed to provide a means of dealing with alcohol-related problems, consistent with express Colorado legislative policy to treat alcoholism as a societal rather than purely criminal problem, is an activity that violates any clearly established law.

Plaintiffs have argued that·the individual officers, who are not named as defendants in this litigation except as "John Doe" defendants, violated Colorado's emergency commitment statute by failing to make a probable cause determination that the plaintiffs taken to detox were clearly dangerous to themselves or others. However, it appears to this Court that plaintiffs' arguments fail, in that Colorado has determined evaluation of persons taken to be detox shall be made by the administrator or the authorized designee of the facility, rather than the law enforcement authorities who bring persons there for evaluation. The probable cause contemplated by the statute, in the view of this Court, requires that the person taken to detox have been intoxicated and clearly dangerous to the health and safety of himself or others. The rights plaintiffs assert have been ·violated are generalized. They have not described the contours of the rights alleged to have been violated with the requisite specificity. There are no bright line definitions to guide police in deciding when an individual is intoxicated to such a degree as to require evaluation by detox personnel.

Fourth Amendment law, as it is defined and developing in the Tenth Circuit, notes that not all police-citizen encounters will implicate the Fourth Amendment. *Latta v. Keryte,* 118 F.3d 693, 698 (10th Cir.1997). In that case, the plaintiff had been stopped after the officer had been informed by his dispatcher that a possibly intoxicated driver was slumped over the steering wheel of a vehicle on Interstate 25. When the officer parked his patrol car, he observed that the driver was leaning over the steering wheel and looking at him through his rearview and outside mirrors. The driver was also fumbling with something under the seat. The driver was unkempt, dirty and appeared to have been on a drinking binge. When the officer asked to see the driver's license, the driver instead asked for the officer's identification. When the officer reached into his wallet for his identification, the driver started his car and drove off.

The driver failed to stop, although the officer was in pursuit close behind. The officer became concerned the driver would leave the Interstate and cause an accident, and received permission from his superiors to use other means to stop the driver. The officer shot the vehicle's left tire, which went flat. The driver did not stop. He shot the other front tire out. In the meantime, a roadblock was set up by the county sheriff's department and the police department. The driver stopped about 40 to 50 feet from the roadblock. Officers approached the vehicle, asked the driver to get out of the car, but the driver did not do so. He was then forcibly

removed, placed face down on the ground and his feet and hands were restrained.

The officer retrieved the driver's license and contacted the dispatcher, who then informed him the car was registered to a Margaret Brock. Ms. Brock was contacted, and she explained that the driver of the vehicle was her son, who suffered from paranoid schizophrenia. The driver, Latta, began hyperventilating. The officer requested an ambulance. After the ambulance arrived, Latta was taken to the emergency room, treated and admitted for treatment and observation. Latta was never formally arrested.

Latta sued pursuant to 42 U.S.C. § 1983, alleging violations of his Fourth and Fourteenth Amendment rights, and violations of state law. He asserted that the defendants violated his Fourth Amendment right to be free from an unlawful seizure because the officer did not have reasonable suspicion to seize him during the initial investigative stop, did not have reasonable suspicion or probable cause to seize him at the roadblock, and used excessive force in seizing him at the roadblock.

The Tenth Circuit noted that when a police-citizen encounter rises to the level of a seizure, the seizure must "be supported by the requisite level of suspicion or probable cause." *Latta v. Keryte*, 118 F.3d at 698–699 "Reasonable suspicion requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch." *Id.* (quotation omitted).

The officer must be "able to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant that intrusion."

In contrast to investigative detentions, formal arrests or seizures that resemble formal arrests must be supported by probable cause .... "probable cause to arrest exists when officers have knowledge of facts that would warrant a person of reasonable caution in the belief that an offense has been or is being committed." ... In determining whether probable cause exists, we look to the "circumstances

as they would have appeared to a prudent, cautious, trained police officer." ...

*Id.* at 699 (citations and quotations omitted).

The circuit court stated that no seizure occurred until Latta was stopped at the roadblock. The record clearly demonstrated that the defendants had probable cause to arrest Latta at the roadblock. The use of force at the roadblock was objectively reasonable under the totality of the circumstances. A reasonable officer would have concluded that Latta posed a danger to himself and other motorists, as a possibly intoxicated driver, who had refused to pull over when requested to do so. When the officers learned that Latta suffered from mental problems, he was released into the custody of medical personnel—conduct which was objectively reasonable. The circuit court determined that the plaintiff failed to establish that the defendant violated Fourth or Fourteenth Amendment rights, and thus, that the officer was entitled to qualified immunity on the plaintiff's claims against him.

A case that provides another useful analogue is *Pino v. Higgs*, 75 F.3d 1461 (10th Cir.1996). In that case an individual brought a § 1983 action against a social therapist, an emergency room physician, two police officers, and a deputy sheriff claiming her constitutional rights were violated when she was taken from her home and transported and detained for emergency mental health evaluation at two different hospitals.

The plaintiff's family had contacted a social therapist who had treated her at an earlier time after plaintiff had not eaten for several days and appeared to be despondent. The social therapist then notified the police department. Officers were dispatched to plaintiff's residence to investigate the situation. They found plaintiff locked in her bedroom refusing to come out. The officers then contacted the therapist to verify the information that she had received from the family. The social therapist then recommended to the officers that the plaintiff be taken to the hospital for psychiatric evaluation. Eventually, the officers were able to convince the plaintiff to open the door and were able to talk with her. Although plaintiff claimed she was fine, the officers insisted she go to the

hospital, in restraints if necessary. Eventually she relented and rode unrestrained in the back of one of the officer's cars to the hospital.

Once at the hospital, the emergency room physician on call examined plaintiff and determined she was severely depressed and likely to harm herself. The social therapist also questioned plaintiff at the hospital and agreed with the emergency room physician that she required further evaluation. The emergency room physician filled out a form required by state law indicating plaintiff appeared to be mentally ill, that she presented a likelihood of danger to herself or others, and that immediate detention was necessary to prevent such harm. Because there was no space at that hospital, it was determined plaintiff would have to be taken to another hospital. Plaintiff again refused to go. With the emergency room physician's certification that plaintiff was mentally ill and was likely to harm herself, a deputy sheriff told plaintiff he would restrain her if necessary in order to transport her to another hospital. She yielded, and accompanied by a female transport officer and a member of her family, plaintiff was taken to another hospital, where the deputy released plaintiff into the custody of that hospital's staff. After she was evaluated, plaintiff was admitted to the hospital and the deputy sheriff left. She remained in the second hospital two days, after which the hospital staff concluded she was not mentally ill and released her.

The plaintiff sued under § 1983, claiming as constitutional violations the deprivation of her liberty, deprivation of due process and unreasonable seizure in violation of the Fourth Amendment. The circuit court noted it was undisputed the actions of the officers and deputy were state actions taken under color of state law. *Pino v. Higgs*, 75 F.3d at 1464.

One of the issues before the court was whether the law enforcement officers were entitled to qualified immunity. The court determined that the officers acted reasonably under the circumstances and in accordance with New Mexico's involuntary commitment statute in detaining and transporting the plaintiff to the hospital. The officers had learned from plaintiff's family she had not eaten and that she might have been suicidal.

When they met her, plaintiff was in her nightgown and appeared disheveled. In light of the evidence before them, it was reasonable for the officers to conclude she posed a threat to herself and should be taken to the hospital for evaluation for her own protection. *Id.* at 1467–1468.

It was also reasonable for the deputy transporting the plaintiff to the second hospital to rely on the emergency room physician's certification as to her mental state. The circuit court determined that there was not sufficient evidence to demonstrate the law enforcement officers did not act reasonably and therefore, that the plaintiff had failed to allege a constitutional violation under the Fourth Amendment. *Id.* It stated:

> Because the Appellees acted reasonably in detaining and transporting Appellant, our conclusion is not affected by the fact that LVMC [the second hospital] subsequently determined that Appellant did not pose a threat to herself or others. "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433. *See also Summers v. State of Utah*, 927 F.2d 1165, 1166–67 (10th Cir.) ("Since probable cause for a warrantless arrest is determined in terms of the circumstances confronting the arresting officer at the time of the seizure, the validity of such an arrest is not undermined by subsequent events in the suspect's criminal prosecution, such as dismissal of charges or acquittal.)" (citations omitted).

> "Moreover, because Appellant has failed to establish that Appellees unreasonably seized her in violation of the Fourth Amendment, her Fourteenth Amendment due process claims also necessarily fail. To the extent that the involuntary seizure of a person for an emergency mental health evaluation mirrors a criminal arrest, the Fourth Amendment's protection against unreasonable searches and seizures more specifically applies to Appellant's situation than the Fourteenth Amendment's general substantive and procedural due process guarantees. In this context, procedural due process affords

Appellant no more protection than her right to be free from unreasonable seizure, since [t]he Fourth Amendment probable cause requirement was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of persons or property in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh,* 420 U.S. 103, 125 n. 27, 95 S.Ct. 854, 868 n. 27, 43 L.Ed.2d 54. Since Appellant has not established that Appellees acted unreasonably in seizing her, it follows that she had not established that they violated her procedural due process rights.

Appellant's claim that appellees violated the Fourteenth Amendment's substantive due process guarantee is even less availing. As the Supreme Court explained in *Albright v. Oliver,* 510 U.S. 266, 273–75, 114 S.Ct. 807, 813, 127 L.Ed.2d 114, a constitutional challenge based on a claim that a prosecution lacked probable cause must be brought under the specific guarantees of the Fourth Amendment rather than the generalized guarantee of substantive due process. Cf. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive government conduct, that amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims [of excessive force during arrest].") Likewise, Appellant's claim that she was unreasonably detained and transported must be brought under the Fourth Amendment. . . .

*Pino v. Higgs,* 75 F.3d at 1468–1469 (most citations omitted).

 This Court finds that the suit against Chief Montoya, in his capacity as supervisor of the individual police officers employed by the City of Trinidad, is not proper in this case. It is fundamental that a supervisor may not be held liable in a section 1983 action under a theory of *respondeat superior,* in the absence of some "affirmative link" between the alleged deprivation of a federal right and the personal control by the supervisor. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 691–695, 98 S.Ct. 2018, 2036–2048, 56 L.Ed.2d 611 (1978); *Gagan v. Norton,* 35 F.3d 1473, 1476 (10th Cir.1994). In this case, there are no allegations that unequivocally lead to this conclusion or establish such an affirmative link.

 Additionally, as stated above, qualified immunity will protect public officials from individual liability unless the official violated clearly established constitutional rights of which a reasonable person would have known. *Workman v. Jordan,* 32 F.3d 475 (10th Cir.1994). Once a defendant in a section 1983 action raises the qualified immunity defense, the burden shifts to the plaintiff to show both facts and law to establish that the defendant is not entitled to qualified immunity. *Id.* at 479; *See also Albright v. Rodriguez,* 51 F.3d 1531, 1534–1535 (10th Cir.1995) (A defendant is entitled to qualified immunity if the plaintiff fails to show a violation of a constitutional right at all; also entitled to qualified immunity if the plaintiff fails to show that the law was clearly established).

Plaintiffs have failed to establish that a violation of a constitutional right occurred at all. The law in 1995, at the time of the issuance of General Order 95–03 (and even prior to 1995, when the Trinidad Advisory Board was meeting and planning the reopening of the Trinidad detox facility), was not clearly established so as to support the type of claim that has been alleged by plaintiffs in this case. The plaintiffs have not cited any authority that provides meaningful support to their claims of constitutional violations. This Court in its own research has been unable to discover any law that supports the claims asserted by plaintiffs in this case, particularly as they challenge the issuance of General Order 95–03 as a policy designed to see that the Trinidad detox facility was fully utilized and would remain open. Reviewing the totality of the circumstances, the Court finds that the City defendants, including Mayor Sayre,[5] Chief Montoya, and the un-

---

5. Except as the Mayor may have participated in the plan to reopen the Trinidad Crossroads detox facility, there are simply no allegations against defendant Sayre that withstand scrutiny. He is

named John Doe police officer defendants are entitled to qualified immunity from suit on plaintiffs' § 1983 claims against them. This Court concludes that there is no clearly established law that was violated by the City defendants when plaintiffs were taken by law enforcement officers to detox for evaluation by the Crossroads staff. The Court finds that the plaintiffs have failed to carry their heavy two-part burden to defeat the defendants' claims of qualified immunity. The Court finds that no constitutional violations occurred when plaintiffs were taken to the Crossroads detox facility in Trinidad by law enforcement authorities, to be evaluated by the Crossroads staff as to appropriate decisions regarding continued detention in that facility.

Accordingly, the Court finds that all City defendants, including the City of Trinidad, its Mayor Harry Sayre in his official capacity, its Chief of Police, James Montoya, and unnamed police officers, and all County defendants, including Las Animas County, Sheriff of Las Animas County Lou Girodo and unnamed deputies, the Board of Commissioners of Las Animas County, and in their official capacities, Commissioners Eugene Lujan, Stanley Biber and Phil Valdez, are entitled to judgment as a matter of law on plaintiffs' § 1983 claims.

*3. Section 1983 Issues as to Crossroads Managed Care Systems, Inc.*

■ The Court also finds that the motion for summary judgment filed by Crossroads should also be granted, for the reason that Crossroads is not a state actor acting under color of state law. We again rely on *Pino v. Higgs,* 75 F.3d 1461 (10th Cir.1996) in analyzing these issues. The circumstances of that case are set out at length in the preceding sections of this Order. In the *Pino* case, plaintiff sued the private social therapist and the emergency room physician. The district court had granted summary judgment in favor of those defendants because neither met the definition of "state actor" and could not be subject to § 1983 liability. In considering whether the therapist (who had telephoned the police and instructed them to detain and transport plaintiff to the hospital for evalua-

tion and who also participated in the decision to transport her to the second hospital), nothing indicated the therapist was a state officer or employee, and it was therefore, proper for the district court to consider her a private individual. The circuit court continued:

> In order to hold a private individual liable under § 1983 for a constitutional violation requiring state action, a plaintiff must show under *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753, that the individual's conduct is "fairly attributable to the State." As stated in *Wyatt v. Cole,* 504 U.S. 158, 162, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (quoting *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753):
>
>> "This requirement is satisfied ... if two conditions are met. First, the 'deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.' Second, the private party must have 'acted together with or ... obtained significant aid from state officials' or engaged in conduct 'otherwise chargeable to the State.'"

In *Lee v. Town of Estes Park,* 820 F.2d 1112, 1114 (10th Cir.), we stated:

> "[I]n order to hold a private individual liable under § 1983, it must be shown that the private person was jointly engaged with state officials in the challenged action, or has obtained significant aid from state officials, or that the private individual's conduct is in some other way chargeable to the State."

Relying on the "close nexus" test developed in *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534, Appellant argues that Wolf acted in such close association with the police officers that her actions are attributable to the state, and therefore she acted under color of state law. As the Supreme Court stated in *Blum,* however, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encourage-

merely one of the players alleged by plaintiffs to have participated in the plan to see that the

Trinidad detox facility was reopened and continued to be fully utilized.

ment, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* In *Blum,* the Court concluded that a private nursing home's decision to discharge or transfer a patient did not constitute a state action simply because the state responded by adjusting a patient's Medicaid benefits, where the state did nothing to command the nursing home's decision. *Id.* at 1005, 102 S.Ct. at 2786.

As with the private conduct in *Blum,* Wolf's conduct does not rise to the level of state action simply because Officers Higgs and Faust responded to her call to the dispatcher and heeded her advice to transport Appellant to the hospital. Moreover, Wolf, by her actions at Socorro General or otherwise, did not exercise "some right or privilege" or act under a "rule of conduct" created by state law as required by *Lugar.*

Without any grant of authority from the state, Wolf could no more be subject to a § 1983 action than Appellant's family members who reported the situation in the first place. As we stated in *Lee:*

"We are disinclined to apply *Lugar* to a fact situation where a private party is simply reporting suspected criminal activity to state officials who then take whatever action they believe the facts warrant."

820 F.2d at 1115. This statement applies with equal force to situations involving private reports of noncriminal activities requiring a response from state officials.

*Pino v. Higgs,* 75 F.3d at 1465.

The plaintiff had also complained that the emergency room physician violated her civil rights when he examined, detained, and then authorized her transport to the second hospital. The emergency room physician was a private physician and not a state officer or employee. Again, the circuit court required a determination of whether the doctor's actions were "fairly attributable to the state" under the *Lugar* analysis.

The circuit court reviewed the provisions of the New Mexico involuntary commitment statute regarding procedure to be followed when a person is brought into a hospital for an emergency health evaluation. The relevant statute, Section 43–1–10(E) provided:

The admitting physician or certified psychologist shall evaluate whether reasonable grounds exist to detain the proposed client for evaluation and treatment, and, if such reasonable grounds are found, the proposed client shall be detained. If the admitting physician or certified psychologist determines that reasonable grounds do not exist to detain the client for evaluation and treatment, the client shall not be detained.

The circuit court examined the relevant circumstances relating to the emergency room physician. The hospital to which plaintiff had been taken was not a state hospital. The language of the applicable statute was mandatory, but the state had no authority and could not require the admitting doctor to examine a "proposed client" anymore than it could require examination of any other person who appeared at the emergency waiting room. Thus, the doctor was a private physician and his were not "state actions." There was no question that the doctor was a licensed physician; there was no question that he examined plaintiff and determined she required further evaluation and treatment.

The plaintiff had argued that the doctor became a state actor when he certified her for transport under § 43–1–10(A) of the New Mexico commitment statute, which provided:

"A peace officer may detain and transport a person for emergency mental health evaluation and care in the absence of a legally valid order from the court only if: . . . .

"(4) a licensed physician or a certified psychologist has certified that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate detention is necessary to prevent such harm. Such certification shall constitute authority to transport the person."

The circuit court stated:

A private physician who certifies a person for purposes of § 43–1–10(A) is not subject to § 1983 liability simply because a state police officer responds by transporting or detaining that person. As the Supreme Court held in *Blum,* 457 U.S. at 1008, 102 S.Ct. at 2787, a state is not responsible for decisions that "ultimately

turn on medical judgments made by private parties according to professional standards that are not established by the State."

Two circuits have concluded that private party actors under state statutes that permit but do not compel, encourage, or pressure a private physician to execute certificates authorizing involuntary mental health examinations do not constitute state actions. *Harvey v. Harvey,* 949 F.2d 1127, 1130–31 (11th Cir.); *Spencer v. Lee,* 864 F.2d 1376, 1379 (7th Cir.). For reasons similar to the reasons discussed in those cases, we conclude that Dr. Weiss' certification of Appellant for transport under § 43–1–10(A) did not constitute state action.

*Pino v. Higgs,* 75 F.3d at 1466.

The Tenth Circuit also addressed the state action concepts in an earlier case, *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442 (10th Cir.1995) Extensive state regulation, receipt of substantial state funds, and performance of important public functions will not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action. *Gallagher,* 49 F.3d at 1451. There is no "bright-line" rule for determining whether a symbiotic relationship exists between a government agency and a private entity. *Id.* at 1452.

> Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

*Id.*

Also significant to this case is the Tenth Circuit's discussion in *Gallagher* relating to the joint action analysis used to evaluate whether a private party is a state actor:

> State action is also present if a private party is a "willful participant in joint action with the State or its agents." ... Unlike the symbiotic relationship inquiry undertaken in *Burton [v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)] and its progeny, the focus of this test is not on long-term interdependence between the state and a private entity. Instead, courts examine

whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights ... Just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient....

> In applying this test, some courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts conclude that "[a] requirement of the joint action charge ... is that both public and private actors share a common, unconstitutional goal...." Under this conspiracy approach, state action may be found if a state actor has participated in or influenced the challenged decision....

> Other courts applying the joint action test have focused on the manner in which the alleged constitutional deprivation is effected. These decisions hold that, if there is a "substantial degree of cooperative action" between state and private officials, ... or if there is "overt and significant state participation," ... in carrying out the deprivation of the plaintiff's constitutional rights, state action is present. Courts have found such cooperative action and overt participation in a variety of circumstances.... However, some state involvement is too minimal to establish that a private actor and a state official have jointly participated in a deprivation of constitutional rights....

> * * * [reviewing various cases]

> ... Under this approach, state and private entities must share a specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action.... 

*Id.* at 1453–1455 (citations omitted).

The public function test is also discussed in *Gallagher:*

> If the state delegates to a private party a function "traditionally exclusively reserved to the State," ... then the private party is necessarily a state actor.... This test is difficult to satisfy. "While many functions have been traditionally performed by governments, very few have been exclusively reserved to the state.'"
> ...

Nevertheless, the Supreme Court has found some functions to satisfy this test. These traditional state functions include administering elections of public officials, ... the operation of a company-owned town, ... and the management of a city park.... However, the Court has also declined to find an exclusive state function in a wide variety of circumstances[:] [nursing home care]; [education of children]; [enforcement of a statutory lien by a private warehouse].

*Id.* at 1456 (citations omitted).

Finally, under the "nexus" test:

... a plaintiff must demonstrate that "there is a sufficiently close nexus" between the government and the challenged conduct such that the conduct "may be fairly treated as that of the State itself." ... Under this approach, a state normally can be held responsible for a private decision "only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." ... The test insures that the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains....

As is the case with all of the various tests for state action, the required inquiry is fact-specific. Nevertheless, the Supreme Court has established a number of important general principles. First, the existence, of governmental regulations, standing, alone, does not provide the required nexus ... Similarly, the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action ... Finally, under the nexus test, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." ...

*Id.* at 1448 (citations omitted).

Under any of the tests that have been discussed by the Tenth Circuit, the Court believes that plaintiffs have failed to demonstrate that Crossroads is a state actor. It is unquestionable that Crossroads and its representatives did in fact participate with the defendants and other representatives of the Trinidad community, in the meetings designed to see that the Trinidad detox facility would re-open and be utilized in an amount sufficient to justify its continued operation. However, there is no law that precludes this type of community involvement; there is no law that precludes a facility from attempting to see that its services are in fact used by the community it seeks to serve.

Crossroads does receive state funding and is subject to certain regulation by the State of Colorado. This alone, however, is not enough to find Crossroads is a state actor. The public function test is not satisfied, as the State of Colorado has not delegated to Crossroads a function traditionally reserved to the state. The nexus test is not satisfied, because there is no showing whatsoever that any decisions made concerning a plaintiff who had been taken to detox, including admission and treatment in the detox facility, were decisions that should be deemed to be those of the State. There is no indication that the State participated in the making of decisions regarding any plaintiff in this case. Crossroads evaluates persons taken to detox and then makes a decision as to whether the individual should be held or released. There is no allegation in the complaint that by engaging in this activity Crossroads has acted beyond the scope of the authorizing statute.

The Court finds that plaintiffs have failed to state a cognizable § 1983 claim against Crossroads in this case under any of the tests discussed above. Accordingly, Crossroads is entitled to entry of summary judgment in its favor.

### 4. *Pendent State Law Claims*

■ With respect to plaintiffs' pendent state law tort claims, the Court declines to exercise supplemental jurisdiction over those tort claims in this case pursuant to 28 U.S.C. § 1367. Where a court is unable to find any state action, Section 1983 does not provide a threshold over which access can be gained to federal court. In the absence of the federal claims, this Court would not have subject

matter jurisdiction over any of the asserted state law claims.

A district court's decision to dismiss or proceed to hear pendent state law claims is one of discretion. Judicial economy, fairness, convenience, and comity are all considerations that will guide a district court's decision to defer to a state court rather than retaining and disposing of state law claims itself. *See e.g. United Mine Workers v. Gibbs,* 383 U.S. 715, 726–727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Sawyer v. County Creek,* 908 F.2d 663, 668 (10th Cir.1990).

These considerations are also embraced in the applicable statute, 28 U.S.C. § 1367, providing for the exercise of supplemental jurisdiction by the district court. This section provides in part, as follows:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

In *Ball v. Renner,* 54 F.3d 664 (10th Cir. 1995), a state law intentional infliction of emotional distress claim was dismissed on summary judgment by the district court. The Tenth Circuit reversed that decision and remanded with instructions to dismiss the state law claim without prejudice, stating "where a state law cause of action is thus in a process of current evolution, it is particularly appropriate for the federal courts to leave the continuing development and application of that cause of action to the state courts." *Ball v. Renner,* 54 F.3d at 669.

In this case, the parties have cited authority of the Colorado Supreme Court concerning the scope of the Colorado emergency commitment statute. This Court believes that this case is one in which the State of Colorado has a significant interest as it raises genuine issues regarding the scope, implementation and actual application of the state's emergency commitment statute allowing detention of intoxicated individuals. The state law claims involving this particular statutory scheme are the type of claims a district court should dismiss without prejudice, leaving to the state court the continuing development and application of state law. This Court declines to exercise supplemental jurisdiction in this case over plaintiffs' pendent state claims. The plaintiffs' claims against the defendants are tort claims, for which state tort remedies may or may not exist under the facts of this case. *See Hilliard v. City and County of Denver,* 930 F.2d 1516, 1520 (10th cir.1991). These issues are best resolved in the forum provided by the state courts, particularly in the circumstances of this case. Therefore, the plaintiffs' pendent state law claims, shall be dismissed without prejudice.

*5. John Doe Defendants*

There are no specific claims whatsoever asserted against any of the City John Doe defendants or the County John Doe defendants. Because plaintiffs have asserted no claims which would entitle them to relief against the John Doe defendants for the County of Las Animas and the City of Trinidad, all claims against the John Doe defendants for the City and County must be dismissed.

Accordingly, and for the foregoing reasons, it is therefore

**ORDERED** that the Motion for Summary Judgment filed by the County defendants, including the County of Las Animas, Lou Girodo, Las Animas County Sheriff, in his individual and official capacity, the Board of Commissioners of Las Animas County, Colorado, Eugene Lujan, Commissioner, individually and in his official capacity, Stanley Biber, Commissioner, individually and in his official capacity, and Phil Valdez, Commissioner, individually and in his official capacity, on plaintiffs' 42 U.S.C. § 1983 claims shall be, and is, **GRANTED**. It is further

**ORDERED** that the Motion for Summary Judgment filed by the City defendants, in-

cluding the City of Trinidad, its Mayor Harry Sayre, in his official capacity; and its Chief of Police, James Montoya, on plaintiffs' 42 U.S.C. § 1983 claims shall be, and is, **GRANTED**. It is further

**ORDERED** that the Motion for Summary Judgment by Defendant Crossroads Managed Care Systems on plaintiffs' 42 U.S.C. § 1983 claims shall be, and is, **GRANTED.** It is further

**ORDERED** that all claims filed by plaintiffs against John Does I–XV, Deputy Sheriffs of Las Animas County, individually and in their official capacities, and John Does XVI–XXX, Peace Officers of the Trinidad Police Department, individually and in their official capacities, shall be, and are, **DISMISSED FOR FAILURE TO STATE A CLAIM.** It is further

**ORDERED** that all pendent claims asserted by plaintiffs against all of the defendants shall be, and are, **DISMISSED WITHOUT PREJUDICE.**

**Judgment shall be entered accordingly.**

APPENDIX

General Order

95–04

**General order 95–03 is rescinded and replaced as follows:**

Effective immediately, when an Officer has contact with any individual who exhibits intoxication resulting from the ingestion of alcohol, drugs, inhalants or any combination of those substances, the subject is to be evaluated for consideration of detox treatment by the officer(s) having direct contact with the individual. A brief notice or memorandum must be submitted to the office of the Chief of Police stating the identity, date of birth, address, and circumstances of contact, on detox commit-tals, prior to the completion of the same work shift. Officer's activity logs are required to contain confirming information. An intoxicated or incapacitated individual is a person whose mental or physical functioning is temporarily but substantially impaired as a result of the presence of alcohol in the body. This incapacitation as a result of the use of alcohol, must impair the judgement of the individual making the person incapable of realizing and making a rational decisions [sic] with respect to his / her basic personal needs or safety, or lacks sufficient understanding or capacity to make or communicate rational decisions concerning his / her person. Officers placing individuals into emergency protective custody must only do so based on probable cause that such person is intoxicated and incapacitated by alcohol and is clearly as a danger to the health and safety of him herself or others.

All intoxicated D.U.I., D.U.I.D., D.W.A.I., intoxicated underage drinking arrests 18–21 years of age, any person arrested who is intoxicated by alcohol or other substances, who is a danger to his her health or safety or that of others, will be evaluated for emergency protective custody into the Detox Center. Specifically, any person who is a danger to himself or others as a result of alcohol or drug ingestion is to be evaluated for placement into protective custody in the Detox Center. The decision to accept a subject into detox treatment rests solely with Crossroads Managed Care Systems staff.

Any individual contacted and meeting EPC detox criteria, will be medically cleared by Officers in the following situations:

1. Adolescent individuals

2. Pregnant females

3. Obviously injured individuals

Officers should have individuals meeting any of the three above criteria medically cleared at the Emergency Room, prior to admitting the person to detox.

Additionally, Crossroads Managed Care Systems will not accept an unconscious client or any injured person who refuses medical treatment. Adolescent persons (minors under the age of 18 years) must be signed into treatment by a consenting parent or legal guardian, or committed by the order of the court. In order to avoid conflict, officers should not refer any subject who meets the refusal criteria to Detox.

Executed: November 06, 1995

James A. Montoya, Chief of Police