George CARBERRY, Plaintiff-Appellee,

v.

ADAMS COUNTY TASK FORCE ON ALCOHOLISM, and the State of Colorado, Defendants-Appellants.

No. 82SA38.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1983.
Rehearing Denied Nov. 29, 1983.

Richard M. Borchers, Westminster, for plaintiff-appellee.

J.D. MacFarlane, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Anthony Marquez, Asst. Atty. Gen., Human Resources Section, Denver, for the State of Colo., defendant-appellant.

Skelton, Oviatt & O'Dell, Robert M. Willson, Wheat Ridge, for Adams County Task Force on Alcoholism, defendant-appellant.

ERICKSON, Chief Justice.

The defendants-appellants, Adams County Task Force on Alcoholism and the State of Colorado, appeal a judgment of the District Court of Adams County which declared section 25–1–310, C.R.S.1973 (now in 1982 Repl.Vol. 11), unconstitutional and in violation of the due process provisions of the United States and Colorado Constitutions. *U.S. Const.,* amend. XIV; *Colo. Const.* art. II, § 25. The judgment of the district court is reversed and vacated.

### I.

In the early morning hours of October 20, 1979, the plaintiff-appellee, George Carberry, was walking toward his home when stopped by Northglenn police officers. Carberry was intoxicated and was taken to Washington House, an alcohol detoxification center run by the defendant-appellant, Adams County Task Force on Alcoholism.

Upon arrival at Washington House, the officers made a written application, pursuant to section 25–1–310, C.R.S.1973, for the emergency commitment of Carberry. Section 25–1–310 provides in pertinent part:

"(1) When any person is intoxicated or incapacitated by alcohol and clearly dangerous to the health and safety of himself or others, such person shall be taken into protective custody by law enforcement authorities or an emergency service patrol, acting with probable cause, and placed in an approved treatment facility. If no such facilities are available, he may be detained in an emergency medical facility or jail, but only for so long as may be necessary to prevent injury to himself or others or to prevent a breach of the peace....

"(2) A law enforcement officer, emergency service patrolman, physician, spouse, guardian, or relative of the person to be committed or any other responsible person may make a written application for emergency commitment under this

section, directed to the administrator of the approved treatment facility. The application shall state the circumstances requiring emergency commitment, including the applicant's personal observations and the specific statements of others, if any, upon which he relies in making the application. A copy of the application shall be furnished to the person to be committed.

"(3) If the approved treatment facility administrator or his authorized designee approves the application, the person shall be committed, evaluated, and treated for a period not to exceed five days. The person shall be brought to the facility by a peace officer, the emergency service patrol, or any interested person. If necessary, the court may be contacted to issue an order to the police or sheriff's department to transport the person to the facility.

"(4) If the approved treatment facility administrator or his authorized designee determines that the application fails to sustain the grounds for emergency commitment as set forth in subsection (1) of this section, the commitment shall be refused and the person detained immediately released, and the person shall be encouraged to seek voluntary treatment if appropriate.

"(5) When the administrator determines that the grounds for commitment no longer exist, he shall discharge the person committed under this section. No person committed under this section may be detained in any treatment facility for more than five days; except that a person may be detained for longer than five days at the approved treatment facility if, in that period of time, a petition for involuntary commitment has been filed pursuant to section 25–1–311. A person may not be detained longer than ten days after the date of filing of the petition for involuntary commitment."

The application listed as reasons for commitment:

"Subject was observed walking eastbound on 104th Ave. at I–25 yelling and screaming. When I contacted him, the odor of alcoholic beverages was on his breath. His gait was unsteady and speech confused. Subject is a danger to himself and others, he is incapable of making a rational decision in respect to his need for treatment."

The supervisor on duty approved the application and Carberry was committed to Washington House. Carberry remained in Washington House for a period of four days and was not provided a hearing to challenge the propriety of his detention.

After his release, Carberry filed a complaint in the Adams County District Court seeking declaratory and injunctive relief. He alleged that section 25–1–310 denied him due process by not requiring a judicial hearing prior to commitment.

Following submission of a stipulation and briefs, the district court ruled that section 25–1–310 violated the due process clause of the Fourteenth Amendment. The district court concluded that the emergency commitment procedures of section 25–1–310 provided inadequate standards for determining the qualifications of the facility administrator and that "clearly dangerous" was an inadequate standard for guiding the administrator's decision to commit or release an intoxicated person. The district court concluded that due process requires an independent judicial hearing or an examination by a physician before an individual can be committed under the emergency commitment statute. We do not agree with the district court's conclusion that section 25–1–310 violates due process by failing to provide a judicial hearing prior to the commitment of an intoxicated person.

## II.

The trial court ruled that the standard [1] controlling the qualifications of the pro-

---

1. The only standard for determining the qualifications of the program administrator is that "the program director shall be qualified by pri- or education and/or experience in program administration and alcoholism treatment." 6 C.C.R. 1008–1 § 4.1.2.

gram administrator provided insufficient guidelines to minimize erroneous decisions and that "clearly dangerous" was an unconstitutionally vague standard for committing and releasing intoxicated persons. The court's determination of the constitutionality of the standards was predicated on the following stipulation:

"1. That Plaintiff George Carberry is a resident of Adams County, Colorado and presently lives at 7483 Alcott, Westminster, Colorado.

"2. That Defendant Adams County Task Force on Alcoholism is a Colorado non-profit corporation established to run an alcohol detoxification center pursuant to C.R.S. 25–1–301 (1973), as amended, and known as Washington House. That this detoxification center is funded in part by Defendant State of Colorado and Defendant Adams County.

"3. That in the early morning hours of October 20, 1979, Plaintiff was walking on East 104th Avenue toward his home. At that time, Plaintiff was stopped and questioned by officers of the Northglenn Police Department who determined and discovered that he was intoxicated through use of alcoholic beverages. The parties agree that Plaintiff was intoxicated at this time, and further agree that he was taken by these officers to a facility known as Washington House which is located at 7373 Birch Street, Commerce City, Colorado, and operated by Defendant Adams County Task Force on Alcoholism.

"4. That upon presentment by officers of the Northglenn Police Department to Washington House, Plaintiff was placed into custody on the basis that he was intoxicated at that time. It is further agreed that Plaintiff remained in Washington House for a period of four days. It is further agreed that during the period of time from October 20, 1979 through October 23, 1979, Plaintiff was not allowed any hearing for his continued detention by either an administrative agency or appropriate court. It is agreed that Plaintiff did not seek a writ of habeas corpus during this same period. Plaintiff

would testify that he did not believe that he was free to go from Washington House. Respondents would testify that Petitioner was in a locked facility only part of the time and could have walked away during the latter part of the stay at Washington House.

"5. That it is further agreed by the parties that detention of the Plaintiff was on the basis of C.R.S. 25–1–310 (1973), as amended. The parties do stipulate and acknowledge that the standard as set forth in the statute was followed in this case, and it is agreed that all other matters pertaining to this case are legal in nature and may be decided as a matter of law, based upon facts heretofore stipulated in this document."

■ The stipulation limits the issues which were before the court and provides an insufficient basis for testing the constitutionality of section 25–1–310. Nothing in the stipulation sets forth a factual predicate for determining whether the program administrator was qualified or unqualified to make the commitment decision or to question whether Carberry was improperly confined under the "clearly dangerous" standard. The parties agreed that the standards within section 25–1–310 were fully complied with and that the case rested solely on the legal issues created by the stipulated facts. On appeal Carberry asks us to decide whether the standards are unconstitutionally vague based upon the same stipulation and with no real factual framework upon which we can determine the issue. A statute is presumptively valid and will not be overturned on the basis of speculation or conjecture that it is unconstitutionally vague. *See People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975); *Bayly Manufacturing Company v. Department of Employment,* 155 Colo. 433, 395 P.2d 216 (1965). Therefore, the only issue properly before the trial court was whether Carberry was entitled to a judicial hearing prior to his commitment. We address only that issue.

### III.

■ The threshold inquiry is whether the emergency commitment of Carberry de-

prived him of a liberty interest protected by the due process clause of the Fourteenth Amendment to the United States Constitution and Article II, section 25 of the Colorado Constitution. *See Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *People v. Chavez,* 629 P.2d 1040 (Colo.1981). It is conceded that holding Carberry in Washington House for four days deprived him of liberty. We recognize that "a civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).[2]

■ The dispute in this case centers on whether due process requires a judicial hearing to minimize the risk of an erroneous commitment. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Due process is a flexible standard which does not call for the same procedural safeguards in all situations. *Morrissey v. Brewer, supra; see also Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Chiappe v. State Personnel Board,* 622 P.2d 527 (Colo.1981). Due process prescribes orderly procedures balanced to protect constitutional interests while furthering legitimate governmental objectives. *Chiappe v. State Personnel Board, supra; People v. Taylor,* 618 P.2d 1127 (Colo.1980); *see also R.McG. v. J.W.,* 200 Colo. 345, 354, 615 P.2d 666, 672 (1980) (Dubofsky, J., specially concurring).

■ In the context of an emergency commitment, due process requires consideration of three distinct factors: (1) the weight of the governmental interest in the emergency commitment process; (2) the severity of the deprivation suffered by the individual as a result of the governmental action; and (3) the functional appropriateness of the procedures for minimizing the risk of an erroneous decision, together with the probable values, if any, of additional safeguards. *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903; *People v. Chavez,* 629 P.2d at 1046.

■ The state has a compelling interest in protecting an intoxicated individual and the general public from the catastrophic consequences of alcohol abuse. The state also has an interest in providing treatment to alcoholics "in order that they may lead normal lives." Section 25–1–302, C.R.S. 1973 (now in 1982 Repl.Vol. 11). We recognize, however, that an individual committed under section 25–1–310 has a substantial interest in avoiding the "massive curtailment of liberty" and the "adverse social consequences," resulting from emergency commitment. *Vitek v. Jones,* 445 U.S. at 492, 100 S.Ct. at 1263.

■ In our view, a judicial hearing as a prerequisite to commitment of a clearly dangerous intoxicated person would hinder the government's efforts in controlling alcohol abuse without providing additional procedural safeguards. Due process demands only that a neutral factfinder independently determine that the statutory requirements for commitment and release are satisfied. *Vitek v. Jones, supra; Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Due process does not dictate that the neutral and detached factfinder be "law-trained or a judicial or administrative officer." *Parham v. J.R.,* 442 U.S. at 607, 99 S.Ct. at 2506; *Morrissey v. Brewer,* 408 U.S. at 489, 92 S.Ct. at 2604; *Goldberg v. Kelly,* 397 U.S. at 271, 90 S.Ct. at 1022. An independent factfinder strikes the proper balance between the public's right to protection from alcohol related tragedies and the individual's right to be protected from unjustified commitment. *See People v. Chavez, supra.*

The judgment of the district court is reversed and vacated.

---

**2.** Moreover, involuntary commitment to an alcohol detoxification center can stigmatize an individual generating adverse social consequences. *Vitek v. Jones,* 445 U.S. at 492, 100 S.Ct. at 1263; *Addington v. Texas,* 441 U.S. at 425–426, 99 S.Ct. at 1809.