Danuta TRACZ and Gaspar Manka, By
and Through his next friend and mother
Danuta TRACZ, Plaintiffs–Appellants,

v.

CHARTER CENTENNIAL PEAKS BE-
HAVIORAL HEALTH SYSTEMS, INC.,
a Colorado corporation; American Med-
ical Response of Colorado, a Colorado
corporation; Angela Beckett; and Timo-
thy Justice, M.D., Defendants–Appellees.

No. 98CA0795.

Colorado Court of Appeals,
Div. IV.

March 30, 2000.

Certiorari Denied Oct. 10, 2000.

---

* Sitting by assignment of the Chief Justice under
provisions of the Colo. Const. art. VI, Sec. 5(3),
and § 24–51–1105, C.R.S.1999.

The Law Office of Darin Locke, Darin Locke, Superior, Colorado, for Plaintiffs–Appellants.

Montgomery Little & McGrew, P.C., Richard L. Murray, Jr., Patrick T. O'Rourke, Englewood, Colorado, for Defendants–Appellees Charter Centennial Peaks Behavioral Health Systems, Inc., Angela Beckett and Timothy Justice, M.D.

Overturf & McGath, P.C., Scott A. McGath, Denver, Colorado, for Defendant–Appellee American Medical Response of Colorado.

Opinion by Judge KAPELKE.

Plaintiffs, Danuta Tracz (Tracz) and Gaspar Manka (Manka), appeal from the summary judgment entered in favor of defendants, Charter Centennial Peaks Behavioral Health Systems, Inc. (Centennial Peaks), a Colorado corporation; American Medical Response of Colorado (AMR), a Colorado corporation; Angela Beckett; and Timothy Justice, M.D. We affirm.

In 1995, in response to an advertisement for free mental health screening, plaintiff Tracz was evaluated for depression by Beckett, a counselor employed by Centennial Peaks. Tracz completed a screening form, and her responses indicated that she was moderately to severely depressed and revealed that she seldom felt useful or needed and often felt that others would be better off if she were dead. Based on a 50–minute interview, Beckett concluded that Tracz was potentially suicidal and homicidal as a result of some form of mental illness.

According to Beckett, during the interview Tracz expressed a desire to kill her former boss, a former co-worker, and then herself; refused to identify the former employer, the former boss, or the former co-worker; stated that she had looked at guns in stores and was thinking about buying one; reported symptoms of moderate to severe depression; and would not "contract for safety" by promising not to hurt herself or others until she could receive additional evaluation and treatment.

Tracz, in her own deposition, acknowledged that she might have told Beckett that she hated her boss, was angry at him, and wished to kill him, and that she had refused to agree to contract for safety.

Beckett then reported the information and her conclusion to Justice, a licensed psychiatrist, who authorized a 72–hour involuntary mental health hold on Tracz (the hold-and-treat order) pursuant to § 27–10–105, C.R.S. 1999, and authorized that she be transported to another facility for evaluation and for treatment, if necessary. Beckett and others made the arrangements, and the director of

nursing at Centennial Peaks completed the paperwork for the hold-and-treat. According to Beckett, Tracz refused to listen to explanations about the nature and purpose of the hold or about her rights as a patient, and attempted to leave the building. She was detained with minimal force by the staff of Centennial Peaks.

Tracz was permitted to make a telephone call to her 12–year old son, Manka. She became emotionally upset during the call, however, and had to give the phone to a Centennial Peaks staff member, who explained to Manka that his mother was being held for evaluation. The staff member asked Manka if there were a neighbor with whom he could stay until his mother was able to come home. He responded affirmatively and gave a neighbor's name.

Two AMR employees, both emergency medical technicians, then drove Tracz in an ambulance to another health care facility. One of the AMR employees searched Tracz' purse for weapons, found none, and returned the purse to her. During the drive, one of the employees requested permission to take her vital signs, which Tracz refused to allow. The employee did not persist in his request.

In her deposition, Tracz said that she had entered the ambulance voluntarily; that no force had been used; that the employees had not been hostile, angry, or argumentative; and that she had been reassured by the driver's comments to the effect that she was behaving normally.

Within an hour after Tracz arrived at the other health care facility, an evaluation was completed and she was released upon her promise that she would return voluntarily for additional treatment and would not hurt herself or anyone else in the interim.

Later, Tracz filed this action asserting claims for false imprisonment, outrageous conduct, professional negligence, assault, and battery. She also asserted claims on behalf of her minor son, Manka. Tracz thereafter dismissed all of the claims asserted on behalf of Manka except the one based on outrageous conduct.

The trial court granted defendants' motions for summary judgment as to all remaining claims, and this appeal followed.

## I.

Tracz first contends that the trial court erred in ruling that an in-person evaluation by a qualified person was not required under § 27–10–105, C.R.S.1999, prior to her placement on an involuntary hold. We disagree.

Section 27–10–105, states in pertinent part:

(1) Emergency procedure may be invoked under either one of the following two conditions:

(a) When any person appears to be mentally ill and, as a result of such mental illness, appears to be an imminent danger to others or to himself or herself or appears to be gravely disabled, then a peace officer; a professional person [i.e., person licensed to practice medicine in this state or psychologist certified to practice in this state]; a registered professional nurse . . . ; a licensed marriage and family therapist or licensed professional counselor . . . ; or a licensed clinical social worker . . . each of whom is referred to in this section as the "intervening professional", upon *probable cause* and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by the executive director for a seventy-two-hour treatment and evaluation. . . .

(2) Such facility shall require an application in writing, stating the circumstances under which the person's condition was called to the attention of the intervening professional and further *stating sufficient facts, obtained from the personal observations of the intervening professional or obtained from others whom he or she reasonably believes to be reliable,* to establish that the person is mentally ill and, as a result of mental illness, an imminent danger to others or to such person or gravely disabled. (emphasis added).

The statute itself does not require an in-person evaluation. Rather, it allows a 72–hour hold to be based upon facts obtained by

the intervening professional "from others whom he or she reasonably believes to be reliable." Section 27–10–105(2), C.R.S.1999.

Despite the lack of an in-person evaluation requirement in the statute itself, Tracz urges that, in order to withstand constitutional scrutiny, the statute must be interpreted to require such an evaluation implicitly. We reject the contention.

■ Due process is a flexible standard and does not require the same procedural safeguards in all situations. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Carberry v. Adams County Task Force on Alcoholism*, 672 P.2d 206 (Colo. 1983).

■ As our supreme court stated in *Carberry v. Adams County Task Force on Alcoholism, supra*, 672 P.2d at 210:

> In the context of an emergency commitment, due process requires consideration of these distinct factors:
>
> (1) the weight of the governmental interest in the emergency commitment process; (2) the severity of the deprivation suffered by the individual as a result of the governmental action; and (3) the functional appropriateness of the procedure for minimizing the risk of an erroneous decision, together with the probable value, if any, of additional safeguards.

*See also Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

As to the first factor, there is no question that the government has a compelling interest in the emergency commitment process because of its *parens patriae* duty to protect society against dangerously disturbed individuals and to protect persons who pose a danger to themselves or are gravely disabled. *See Curnow v. Yarbrough*, 676 P.2d 1177 (Colo.1984).

By the same token, however, with respect to the second factor, the severity of the deprivation, an individual who is taken into custody under an emergency involuntary hold has a substantial interest in avoiding the curtailment of liberty and adverse social consequences resulting from emergency commit-

ment. *See Carberry v. Adams County Task Force on Alcoholism, supra*.

As to the third factor, the functional appropriateness of the procedures for minimizing the risk of an erroneous decision, we note that § 27–10–105(2) requires that the person providing factual information to the interviewing professional must be one whom the professional "reasonably believes to be reliable."

In our view, sufficient safeguards against the risk of an erroneous decision are supplied by the requirement of probable cause, together with the requirement that the professional's evaluation be based on factual information from a person reasonably believed to be reliable. Our conclusion is buttressed by the additional safeguard in § 27–10–105(4) mandating that: "Each person admitted to a seventy-two hour treatment and evaluation facility ... shall receive an evaluation as soon after he is admitted as possible...."

The touchstone remains the requirement of probable cause to believe that the individual is mentally ill and, as a result of such mental illness, is an imminent danger to others or to himself or herself or is gravely disabled. The probable cause requirement allows the statute to withstand a constitutional challenge based upon due process. *People v. Marquez–Lopez*, 952 P.2d 788 (Colo.App. 1997).

As a division of this court pointed out in *People in Interest of Paiz*, 43 Colo.App. 352, 356, 603 P.2d 976, 978 (1979): "[A]s in the criminal law, probable cause should not be measured by the yardstick of legal technicality, but by the factual and practical considerations upon which a reasonable physician acts."

In *Paiz*, the division upheld a 72–hour treatment and evaluation hold where the certifying physician's report was based on factual information obtained from the team leader on the hospital ward rather than on an in-person evaluation by the physician himself. The division expressly rejected the contention that the veracity of the ward leader had to be established by information in the physician's report.

Significantly, in *Curnow v. Yarbrough, supra*, the supreme court discussed the pertinent balancing factors and concluded that the involuntary short-term mental health commitment statute contained sufficient safeguards. These included, among others, the professional decision to initiate a 72–hour evaluation, the professional medical evaluation at the time of the involuntary short-term commitment, and the certification signed by a professional medical evaluator.

Upon consideration of the applicable balancing factors and in light of the available safeguards, we conclude that due process considerations do not require an in-person evaluation by an intervening professional.

Finally, we note that Tracz relies on *McLean v. Sale*, 54 N.C.App. 538, 284 S.E.2d 160 (1981), in urging that a first-hand evaluation is required. We find that case distinguishable because the pertinent North Carolina statute expressly mandated an examination by the certifying physician authorizing the involuntary hold. The decision was not based on any analysis of due process requirements.

## II.

Tracz next contends that the trial court erred in ruling that she had to present expert testimony in order to establish her negligence claims. Again, we disagree.

■ To prevail on a claim of professional negligence against a physician or other trained medical professional, a plaintiff must establish that the professional failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by that defendant. Further, unless the alleged negligence concerns subject matter within the common knowledge or experience of an ordinary person, both the standard of care and the defendant's failure to adhere to that standard must be established by expert opinion testimony of a qualified expert witness. *Melville v. Southward*, 791 P.2d 383 (Colo. 1990); *Teiken v. Reynolds*, 904 P.2d 1387 (Colo.App.1995).

The reason for the requirement of expert opinion testimony is that matters relating to medical diagnosis and treatment generally involve a level of technical knowledge and skill beyond the realm of lay knowledge and experience. *Melville v. Southward, supra.*

■ Here, Tracz asserts that Justice and the director of nursing at Centennial Peaks acted negligently by failing to examine her prior to initiating the hold.

The language of § 27–10–105(1)(a), C.R.S. 1999, authorizing the emergency evaluation and treatment hold procedure necessarily implies the exercise of judgment and discretion on the part of the professional instituting the procedure. *See Bauer v. Southwest Denver Mental Health Center, Inc.*, 701 P.2d 114 (Colo.App.1985). Further, as noted above, issues relating to commitment involve "considerations upon which a reasonable physician acts." *People in Interest of Paiz, supra*, 43 Colo.App. at 356, 603 P.2d at 978.

Thus, Tracz' professional negligence claim required a showing that Justice and the director of nursing did not act in conformance with the standard of care required of them as health care professionals. Accordingly, the trial court properly ruled that Tracz had to present expert testimony by a medical witness in order to establish her professional negligence claim against Justice and Centennial Peaks. In light of the absence of such evidence, the trial court properly granted summary judgment on that claim. *See Melville v. Southward, supra.*

■ Tracz also argues that no expert medical testimony was required here because a jury could find negligence on the part of Justice and the director of nursing based on their failure to comply with a policy of the hospital requiring that the professional authorizing a hold and treat do so only after conducting an in-person evaluation. We reject the contention.

As discussed above, to establish a negligence claim against Justice and Centennial Peaks, Tracz had to demonstrate that they failed to conform to the applicable standard of care. Expert medical testimony is needed to define that standard under the circumstances and also to determine whether the defendants' conduct departed from it. The

existence of the hospital policy here does not obviate the necessity for expert testimony in this regard.

■ Further, we agree with the Centennial Peaks defendants that because Tracz had to present expert medical testimony in order to establish a prima facie case on her professional negligence claim, she was required to file a certificate of review pursuant to § 13–20–602, C.R.S.1999. *See Martinez v. Badis,* 842 P.2d 245 (Colo.1992).

Moreover, as the supreme court recently recognized in *State v. Nieto,* 993 P.2d 493 (Colo.2000), the certificate of review requirement also applies with respect to respondeat superior claims asserted against the employer of a licensed professional based upon the alleged negligence of that professional. Thus, Tracz' failure to file a certificate of review provided an additional basis for summary judgment on Tracz' claims against both Centennial Peaks and Justice.

### III.

■ Tracz next contends there were genuine issues of material fact that precluded the entry of summary judgment in favor of the Centennial Peaks defendants on her claim of false imprisonment. Specifically, Tracz asserts that the court erred in concluding that these defendants had established their affirmative defense of legal justification as a matter of law. We disagree.

Essentially, this issue turns on whether there was a proper basis for the emergency 72–hour hold and treat under the circumstances here. As discussed above, we reject Tracz' contention that an in-person evaluation by Justice or the director of nursing was required.

In support of their motion for summary judgment, defendants submitted excerpts from the depositions of Justice, Beckett, and the director of nursing. Those submissions show that there was probable cause to believe that Tracz posed an imminent danger to herself or others as a result of mental illness. Thus, Centennial Peaks, Justice, and Beckett met their initial burden of production to establish their affirmative defense that, in detaining Tracz, they were acting in accordance with a valid hold-and-treat procedure. The burden of production thus shifted to Tracz to show the existence of a genuine issue of material fact. *See AviComm, Inc. v. Colorado Public Utilities Commission,* 955 P.2d 1023 (Colo.1998).

With her response to the motion for summary judgment, Tracz submitted documents and portions of her own deposition, as well as portions of the depositions of Justice, Beckett, and the director of nursing. Those submissions, however, even when considered in the light most favorable to Tracz, do not create an issue as to whether Beckett, Justice, and Centennial Peaks had probable cause ·to believe Tracz posed a threat of imminent danger to herself or others.

In her deposition testimony, Tracz denied having expressed any intent to purchase a gun or kill her former boss or co-worker, and also denied having made other statements attributed to her. However, she acknowledged in her deposition that she told Beckett she was angry at her former boss and hated him. Also, the following colloquy took place in her deposition:

Q: Did you tell Ms. Beckett that you thought you would get a gun and kill him?

A: I was telling her about my anger and revenge, okay? And she was asking me about guns. She probably first started because she was constantly getting back to this gun story, and naively I was telling her that we have guns.

. . . .

Q: [D]id you tell Ms. Beckett that you had a plan about getting a gun to do harm to your boss?

A: It was something I wish to kill those people, maybe.

Tracz was also asked about Beckett's request that she make a contract for safety:

Q: Do you recall being asked to make an agreement or a contract with Centennial Peaks that you would not do harm to your boss?

A: I remember at the end when I was waiting ... So she said—she start to say are you promise me, and what do I have to

promise to this woman? She waste my time. She make me angry. And I said, "No, no, I'm not going to promise you anything," and I went straight to the door.

Thus, Tracz' own admissions, coupled with the other submissions on the motion for summary judgment, demonstrated that, under the circumstances, Beckett had probable cause to believe Tracz posed a danger to herself or others. Further, the record indicates that Justice and the director of nursing also had reason—based on Beckett's report—to believe Tracz posed such an immediate danger. Their defense of legal justification was therefore established as a matter of law. Accordingly, we conclude that the trial court properly granted summary judgment as to Tracz' claims against Justice, Beckett, and Centennial Peaks for false imprisonment.

### IV.

Tracz contends that the trial court improperly granted summary judgment on her own outrageous conduct claim and on the outrageous conduct claim she asserted on behalf of Manka. We perceive no basis for reversal.

■ The elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) defendant's conduct caused plaintiff to suffer severe emotional distress. *Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877 (Colo.1994).

■ Liability for outrageous conduct can be found only if the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. Whether particular conduct is sufficiently outrageous to be actionable is normally a question for the jury. However, it is for the court to determine, in the first instance, whether reasonable persons could differ on this issue. *Meiter v. Cavanaugh*, 40 Colo. App. 454, 580 P.2d 399 (1978).

■ Tracz bases her claim of outrageous conduct against Centennial Peaks, Justice, and Beckett on the same acts and omissions that form the basis of her other tort claims against them.

The claim on behalf of Manka is that a Centennial Peaks employee acted outrageously in making the telephone call to him informing him that his mother was being held for evaluation, in directing him to go to a neighbor's home, and in not taking follow-up actions to ensure that he would be safe.

Viewing the evidence in the light most favorable to plaintiffs, we conclude that no reasonable juror could find that any of the defendants acted outrageously toward either plaintiff.

In light of Tracz' own admissions that she may have told Beckett she hated her former boss and wished to harm him, Beckett's conduct toward Tracz, as well as that of Justice and the Centennial Peaks director of nursing, cannot be considered extreme or beyond all possible bounds of decency. Similarly, the making of the phone call to Manka was not an outrageous action under the circumstances, even if it is assumed that some follow-up action would have been desirable to ensure that he had someone to care for him during his mother's absence.

In his own deposition, Manka acknowledges that the Centennial Peaks employee asked if he had somewhere he could go, and he responded that he did. After the phone call, he went to a friend's house. The Centennial Peaks employee said that Manka had given her the name of the person he could go be with, and she had told Tracz the name of that person. Under the circumstances, the conduct of the Centennial Peaks defendants cannot be considered so extreme as to be beyond all possible bounds of decency. *See Meiter v. Cavanaugh, supra.*

Summary judgment was therefore properly entered as to plaintiffs' outrageous conduct claims.

### V.

Tracz next contends that the trial court erred by granting summary judgment in favor of AMR. We disagree.

**1176**

## A.

Tracz first argues that the court erred by dismissing her claims against AMR for false imprisonment, assault, and battery.

In construing a statute, we must give effect to the intent of the General Assembly. If the plain language of the statute is clear and unambiguous, we must apply it as written. *Singleton v. Kenya Corp.*, 961 P.2d 571 (Colo.App.1998).

Section 27–10–105(1)(a) specifically authorizes the intervening professional to take the mentally ill person into custody "with such assistance as may be required," or to have the person taken into custody by others, and placed in an approved treatment facility. The statute thus plainly contemplates that a mentally ill person may be taken into custody at one place and transported by others to a treatment facility at the behest of the intervening professional.

Furthermore, pursuant to §§ 27–10–105(3) and 27–10–105(4), C.R.S.1999, only the "professional person in charge of the evaluation" may release a person subject to a hold-and-treat order before its expiration. A "professional person" is a licensed physician or licensed psychologist. Section 27–10–102(11), C.R.S.1999.

Here, Tracz does not assert that the emergency hold-and-treat report and application form was invalid on its face. Rather, she argues that if the hold-and-treat was instituted without probable cause or otherwise in violation of the statute, AMR may not rely on the report and application. In essence, Tracz argues that AMR's personnel had a duty to inquire into the basis of the report and application and to exercise independent judgment as to its validity.

To construe the statute as imposing such a duty upon emergency medical personnel and others who might be called upon to assist an intervening professional in carrying out an authorized hold-and-treat procedure would undermine the purpose and intent of the statute. *See Perreira v. State*, 768 P.2d 1198 (Colo.1989) (a purpose of the statute is to protect the public from harm caused by mentally ill persons; under the statute, the decision whether to release a mentally ill patient is entrusted to the special skills and knowledge of licensed psychiatrists and psychologists).

Accordingly, we conclude that, in transporting Tracz to an approved treatment facility, pursuant to an emergency mental health report and application valid on its face, AMR had no duty to make an independent determination as to whether the intervening professional had probable cause to institute the hold-and-treat procedure. Since the asserted existence of such a duty is the only basis for Tracz' claims against AMR for false imprisonment, assault, and battery, and since the hold-and-treat report and application here was valid on its face, the trial court properly granted summary judgment in AMR's favor on such claims.

## B.

Tracz also contends that the trial court erred in dismissing her outrageous conduct claims against AMR. Again, we disagree.

In opposing AMR's motion for summary judgment, Tracz submitted portions of her own deposition and of the depositions of Justice and the director of nursing. None of that evidence demonstrates that AMR's employees engaged in any conduct that could be considered so extreme in degree as to go beyond all possible bounds of decency. *Meiter v. Cavanaugh, supra.* Further, as noted, Tracz testified in her own deposition that those employees had not used any force against her and had not been argumentative, hostile, or angry toward her at any time.

Accordingly, we perceive no error in the trial court's dismissal of plaintiffs' claims of outrageous conduct against AMR.

The judgment is affirmed.

Chief Judge HUME and Judge RULAND concur.